2008-NMSC-065

199 P.3d 281

Joshua MARCHAND, Petitioner–
Petitioner,

v.

Rebecca L. MARCHAND, individually and
as personal representative of the Estate
of Alfred G. Marchand, Respondent–Re-
spondent.

No. 30,608.

Supreme Court of New Mexico.

Oct. 14, 2008.

Steven K. Sanders & Associates, L.L.C., Steven K. Sanders, Albuquerque, NM, for Petitioner.

Stevan J. Schoen, Placitas, NM, for Respondent.

## OPINION

BOSSON, Justice.

{1} Alfred G. Marchand (Alfred) was a flight attendant on United Airlines Flight 175, one of the two airplanes that terrorists caused to crash into the World Trade Center in New York City on September 11, 2001. He was the sole New Mexico resident to die in the tragic events of that day. Alfred died intestate, survived by his wife Rebecca Marchand (Rebecca), his adult son by a previous marriage Joshua Marchand (Joshua), and his dependent stepson Trae Hale (Trae), Rebecca's son by a previous marriage. Rebecca filed for probate of Alfred's estate (the Estate) in September of 2001 and was appointed Personal Representative. The probate of the Estate was closed, and Rebecca discharged as Personal Representative, on December 5, 2003. Joshua received a distribution from the Estate in the amount of $16,553.25, along with a 1989 Chevy Blazer and other personal property. The remainder of the Estate was distributed to Rebecca as Alfred's surviving spouse.

{2} Rebecca applied to the September 11th Victim Compensation Fund ("the Fund") for victim's relief and federal aid on November 28, 2003. The dispute in question involves the proper distribution of the award from that Fund. Before we discuss the specific award in this case, we first set forth a brief background of the Fund and the federal legislation that created it.

### September 11th Victim Compensation Fund

{3} The Fund was created as part of the Air Transportation Safety and System Stabilization Act (Air Stabilization Act), 49 U.S.C. § 40101 (2001), enacted by Congress to provide compensation for those injured or killed in the terrorist attacks of September 11, 2001. Individual claimants were afforded an opportunity to receive an award from the Fund, thereby waiving their right to file civil actions for damages related to the events of September 11, 2001, except to recover collateral source obligations, such as insurance, or to pursue actions against the terrorists responsible for the attacks. Air Stabilization Act, 115 Stat. 240 § 405(c)(3)(B)(i) (2001).

{4} In the case of a person who was killed in the attacks, the Air Stabilization Act designated the Personal Representative of the Estate as the sole eligible claimant. 28 C.F.R. §§ 104.2(a)(2)-(3), 104.4 (2008). After appointment as Personal Representative by a court of competent jurisdiction, the claimant had to provide written notice of the claim to beneficiaries and interested parties to the Estate. 28 C.F.R. § 104.4(b). Upon receipt of a Fund award, and absent an agreed upon distribution plan between the beneficiaries of the award, the Personal Representative was legally obligated to distribute the award according to the law of the decedent's domicile or any applicable state court rulings. 28 C.F.R. § 104.52 (2008).

{5} A Special Master appointed by the United States Attorney General oversaw the implementation of the Fund and determined the amounts to be awarded to claimants based upon the harm to the claimant, the facts of the claim, and the individual circumstances of the claimant. Air Stabilization Act, 115 Stat. 237–38 § 404(a) (2001); § 405(b)(1)(B)(i)-(ii). Fund awards included damages for both economic and non-economic losses. *Id.*, 115 Stat. 238 § 405(b)(1)(B)(I).

{6} Economic loss, defined as "any pecuniary loss resulting from harm," *id.* § 402(5), was calculated through a methodology that took into account anticipated lost benefits such as income and earnings. 28 C.F.R. § 104.43(a) (2008). Non-economic damages were defined as "losses for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship, loss of consortium . . . and all other nonpecuniary losses of any kind or nature." Air Stabilization Act, 115 Stat. 237 § 402(7) (2001). Because of the inherent difficulty in determining non-economic losses for individual claimants, the regulations designated uniform non-economic loss awards of $250,000 for the Estate of the decedent and $100,000 for the spouse and each dependent of the victim. 67 Fed. Reg. 11,233, 11,239 (Mar. 13, 2002); 28 C.F.R. § 104.44 (2008). The Special Master could deviate from such "presumed" non-economic loss amounts in extraordinary circumstances. 28 C.F.R. §§ 104.31(b)(2), 104.33(f)(2) (2008).

{7} The Fund was remarkable for its efforts to guarantee substantial compensation, as opposed to just minimal assistance, for victims of the September 11th attacks. *See generally* Kenneth S. Abraham & Kyle D. Logue, *The Genie and the Bottle: Collateral Sources Under the September 11th Victim Compensation Fund,* 53 De Paul L.Rev. 591, 594 (Winter 2003). However, there was also a concern to avoid over-compensation. *See id.* at 597–98. Important to this appeal, Congress required the Special Master to reduce a claimant's total award "by the amount of the collateral source compensation the claimant has received or is entitled to receive." Air Stabilization Act, 115 Stat. 239 § 405(b)(6). Collateral source compensation included life insurance proceeds, pension funds, and other death benefits programs. 28 C.F.R. § 104.47(a) (2008).

{8} After the Special Master determined the amount to be awarded on a given claim, he would send a letter to the Personal Representative detailing the final award determination. The letter broke down the various components of the award, specified the collateral offsets and beneficiaries to whom those

offsets were attributable, and provided other information to guide the Personal Representative in distributing the award according to the law of the decedent's domicile. 28 C.F.R. § 104.52. The Special Master's award determinations were final and not subject to judicial review. Air Stabilization Act, 115 Stat. 238–39 § 405(b)(3).

**Claim on Behalf of Alfred G. Marchand**

{9} Rebecca filed a timely claim with the Fund as the Personal Representative of the Estate. Her efforts in pursuing the award included retaining a New York law firm, traveling to New York City for testimony, and preparing an economic loss analysis of Alfred's anticipated income. Joshua did not participate in filing the claim with the Fund, nor was he required to. Rebecca submitted a list of all individuals entitled to a Fund award and agreed to distribute any award according to New Mexico law. Though Rebecca submitted a proposed distribution plan for the award, there is no indication in the record that the Special Master ever approved that plan.

{10} The Special Master detailed the final award determination in a letter to Rebecca dated June 24, 2004. The total award before collateral source offsets was $1,847,969.88, comprised of an economic loss component of $1,397,969.88, and non-economic loss awards of $100,000 each for Rebecca and Trae, as spouse and dependent child of the decedent, and $250,000 for the Estate. The letter specified the relevant state law that should govern distribution of each portion of the award. The economic loss portion of the award was to be distributed according to New Mexico wrongful death law; the non-economic loss award to the Estate was to be distributed according to New Mexico intestate law, there being no will of record. The non-economic loss awards to Rebecca and Trae were to go directly to them.

{11} However, the Estate did not actually receive $1,847,969.88. Instead, the Estate received a final award of $769,971.88, reflecting a deduction of $1,077,998 in collateral offsets mandated by the Act, due primarily to pension benefits paid directly to Rebecca for her own use. The Special Master's letter

broke down the amount of collateral offsets attributed to each individual: $1,012,321 was attributable to the benefits received by Rebecca, $25,000 to the Estate, $23,177 to Trae, and $17,500 to Joshua. The letter also instructed as follows: "Generally, collateral offsets should first be applied to the share of the individual who received the benefit. Any excess benefit should be applied to the remaining shares of the award." The proper distribution of the $769,971.88 actually received by the Estate is the subject of this appeal.

**Lower Court Proceedings**

{12} On July 27, 2004, Rebecca filed a motion for subsequent administration in the probate court seeking reappointment as Personal Representative for the purpose of distributing the Fund award. Joshua moved for a temporary injunction on July 19, 2004, to prevent Rebecca from distributing the Fund award. Subsequently, both parties stipulated to removing the probate proceedings to district court and to depositing any Fund payments into the court's registry pending the outcome of the litigation. Both Joshua and Rebecca then moved for summary judgment.

{13} Before the district court, Joshua argued that Rebecca as Personal Representative was obligated to distribute the Fund award according to New Mexico law and as directed by the Special Master's letter. The letter specified that the economic loss portion of the award should be distributed according to New Mexico wrongful death law, while the Estate's non-economic loss award should be distributed according to New Mexico's intestacy statutes.

{14} Under the New Mexico wrongful death law, one-half of a wrongful death award goes to the surviving spouse, and the other half goes to the surviving children. NMSA 1978, § 41–2–3(B) (1939, as amended through 2001). Under New Mexico intestacy statutes, the surviving spouse receives one quarter of the decedent's separate property, and surviving children receive the remaining three quarters. NMSA 1978, § 45–2–102 (1975). Thus, Joshua argued that he was entitled to half of the total economic loss

award prior to collateral offsets, plus three-fourths of the non-economic loss awards to the Estate, Rebecca, and Trae.

{15} Rebecca responded that under federal law, the Special Master's award determination was final and not subject to review. She contended that the economic loss portion of the award was community property, and thus should pass entirely to her as the surviving spouse. She also argued that the $100,000 non-economic loss awards to her and Trae were statutory awards designated for spouses and dependents and were not subject to distribution under intestacy law. Therefore, she reasoned that Joshua was only entitled to $112,000, representing one-half of the non-economic loss award to the Estate after subtracting the $25,000 in collateral offsets allocated to the Estate. Because Joshua had failed to file a claim directly with the Fund or object to the Special Master's allocation of the award, Rebecca argued that Joshua could not "seek to avoid or rearrange the determination of the Special Master."

{16} The district court granted summary judgment in favor of Rebecca, holding that (1) the Special Master's determination of collateral offsets served only to reduce the amount of the total award, and each individual's share of the award should not be reduced by the amount of collateral benefits attributed to that individual; (2) the $100,000 non-economic loss awards to Rebecca and Trae were part of the Special Master's final award determination and not subject to review; (3) the non-economic loss award of $250,000 to the Estate, allocated according to New Mexico intestacy law, was to be divided between Joshua (3/4 as surviving child, $187,500) and Rebecca (1/4 as surviving spouse, $62,500); and (4) the remaining $319,971.88 ($769,-971.88–$450,000), as economic loss, was community property and passed entirely to Rebecca. Joshua appealed from this ruling.

{17} The Court of Appeals reversed in part, holding that the district court erred in classifying the economic loss award ($319,-971.88) as community property that passed to Rebecca. Instead, the Court of Appeals held that the economic loss award should be distributed according to New Mexico's wrongful death statute as directed by the Special Mas-

ter in his June 24, 2004 letter. *Marchand v. Marchand*, 2007–NMCA–138, ¶ 24, 142 N.M. 795, 171 P.3d 309. Under the wrongful death statute, Section 41–2–3(B), Rebecca and Joshua would each be entitled to half the economic loss award without any offset against Rebecca for collateral benefits received by her. Rebecca did not seek review of this holding. The Court of Appeals left undisturbed the other rulings of the district court.

{18} Joshua sought review by this Court, and we granted certiorari to decide whether the collateral benefits assigned to each individual in the Special Master's letter should be applied to offset that individual's portion of the award.

## DISCUSSION

### Standard of Review

■ {19} This case requires us to interpret the Special Master's letter, the relevant federal statutes and regulations, and New Mexico law to determine the proper distribution of the Fund award among Alfred's beneficiaries. These are matters of law that are subject to de novo review. Unfortunately, due to the unique circumstances that gave rise to the Fund, there is little if any law on point to guide us in our decision.

### Collateral Offsets

{20} Joshua argues that the Court of Appeals did not comply with the Special Master's directive that collateral offsets be applied to the share of the individual who received the benefit. According to Joshua, this directive requires that individual shares of the award received by Rebecca and Trae be reduced by the amount of collateral benefits assigned to them in the Special Master's letter. Essentially, Joshua's position is that it would be unfair for Rebecca to receive *any* of the Fund award when she has already received over $1 million in collateral benefits which, in turn, served to reduce the global award, lessening the amount left for distribution to Joshua and all other beneficiaries. Thus, Joshua argues that the collateral benefits received by

Rebecca and Trae should be deducted from their individual portions of the final award and added to his award to bring it closer to the amount he would have received if not for those collateral benefits given to Rebecca and Trae.

{21} The calculations under Joshua's argument would lead to the following result. Rebecca's share of the award, prior to offsetting for collateral benefits, would equal (a) $100,000 non-economic loss award as Alfred's spouse, (b) one-quarter of the $250,000 non-economic loss award to the Estate ($62,500), as directed by the New Mexico intestacy statutes, and (c) one-half of the total economic loss award (prior to subtracting collateral offsets) of $1,397,969.88, or $698,984.94, as directed under the New Mexico wrongful death statutes. When these amounts are added together, Rebecca's share would come to $861,484.94. But Rebecca has already received $1,012,321.00 in collateral benefits, and therefore when one is offset against the other Rebecca would not be entitled to anything at all from the Fund award.[1] Turning to Trae's share of the award, $100,000 in non-economic loss as a dependent of Alfred, Joshua would offset Trae's collateral benefits ($23,177) and reduce Trae's share to $76,823. When Trae's $76,823 is subtracted from the final award of $769,971.88, Joshua would receive the balance or $693,148.88.

{22} Rebecca argues that the collateral offsets are only applied initially by the Special Master to reduce the gross award, but should not be applied to reduce individual allocations from the total award. Thus, she argues that the $769,971.88 actually received from the Special Master already takes into account the collateral benefits, and the final award should simply be divided as is, without accounting for each beneficiary's collateral offsets. The calculations under Rebecca's argument would be as follows. The Special Master awarded a total amount of $1,847,969.88 and then reduced that amount by the total amount of collateral benefits received by all the beneficiaries to reach a

---

1. Joshua does not argue that Rebecca actually *owes* him money, only that she should not receive any money from the Fund so long as the collateral benefits assigned to her outweigh her designated share of the award.

final award amount of $769,971.88. This final amount would then be distributed under state law as directed by the Special Master's letter. Rebecca and Trae would each get $100,000. The $250,000 in non-economic loss would be distributed according to New Mexico intestacy law-one-quarter, or $62,500, to Rebecca and three-quarters, or $187,500, to Joshua. Finally, the remaining $319,971.88 would be divided equally between Rebecca and Joshua pursuant to wrongful death law, each receiving $159,985.94. Thus, Trae's total share of the Fund award would be $100,000; Joshua's would be $347,485.94; and Rebecca's would be $322,485.94. This is also the result counseled by the Court of Appeals.

{23} Both Rebecca and the Court of Appeals construe Joshua's argument as advocating an impermissible "reallocation" of what the Special Master has already calculated which would be contrary to federal law. We disagree. *See Marchand,* 2007–NMCA–138, ¶ 27, 142 N.M. 795, 171 P.3d 309. It is true that the Special Master's calculations are final. But Joshua does not claim that the Special Master incorrectly calculated the amount of collateral benefits attributable to each beneficiary. Rather, Joshua contends that the amount of collateral benefits assigned to each beneficiary should be applied against that individual's share of the award, thereby offsetting each person's share in proportion to the collateral benefits that person has already received. We read the Special Master's letter as directing the application of those offsets to the individual shares, and to that extent we agree with Joshua. However, as we discuss later, we do not agree with Joshua that the offsets apply to all components of the award.

### Application of Collateral Offsets Generally

■ {24} It is true, as Rebecca argues, that the Act and accompanying regulations do not expressly require that an individual's share of a Fund award must be reduced by the amount of collateral benefits that individual received. However, the Air Stabilization Act gives the Special Master power to administer the Fund and determine the amounts to be awarded to individual claim-ants. Further, the Special Master was authorized to "provide such other information as appropriate to provide adequate guidance for a court of competent jurisdiction." 28 C.F.R. § 104.33(g). In this case, the Special Master's letter to Rebecca instructs that "[g]enerally, collateral offsets should first be applied to the share of the individual who received the benefit." The Court of Appeals concluded that this language was without any legal effect, included solely to provide information regarding the origin and calculation of collateral offsets.

{25} We disagree that the Special Master's language has no effect on the award distributions. A plain reading of this language indicates a directive to the Personal Representative to be followed in calculating the appropriate distribution of the remaining award among the beneficiaries. We also note that the Special Master's letter provided a breakdown of collateral offsets, showing the amount of collateral benefits attributable to each individual beneficiary—$1,012,321 to Rebecca, $25,000 to the Estate, $23,177 to Trae, and $17,500 to Joshua. This breakdown, taken in conjunction with the language directing that collateral offsets "should first be applied to the share of the individual who received the benefit," persuades us that the Special Master intended that individual collateral offsets should be applied as an offset to individual awards. If that were not the Special Master's intent, there would seem to be no reason to set forth a breakdown of collateral benefits individually, as opposed to just one lump-sum award.

{26} Our interpretation of the Special Master's letter is also supported by general principles of fairness. We observe that if Rebecca had not received $1,012,321 in collateral benefits, and the others had not received collateral benefits in much smaller amounts (a total of $65,677), the final award for economic loss alone would have totaled $1,397,969.88. After distributing this amount according to the wrongful death statute, Section 41–2–3(B), Joshua would have received half, or $698,984.94. Even subtracting Joshua's collateral benefits actually received, he would have been entitled to nearly that amount. However, Rebecca's disproportion-

ate share of collateral benefits to her personally reduced the total award substantially, and thereby reduced Joshua's share as well to only $159,985.94, being one-half of $319,971.88. Thus, Rebecca's collateral benefits served to reduce Joshua's share of the award by over $500,000.

{27} Under these circumstances, the Special Master's directive embodies a basic notion of fairness. It seeks to avoid excessive compensation for one beneficiary at the expense of the remaining beneficiaries. *See, e.g., Strickland v. Roosevelt County Rural Elec. Coop.,* 103 N.M. 63, 64, 65, 702 P.2d 1008, 1009, 1010 (Ct.App.1984) (holding that the proceeds of a wrongful death award should be divided into equal shares and each beneficiary should reimburse the compensation carrier from his equal share of the total judgment "the amount of workers compensation benefits received by that beneficiary," and noting that "[t]his makes each beneficiary whole and avoids double recovery by either"). For the purpose of clarity we repeat: Rebecca is not entitled to any of the economic loss component of the award. Joshua is entitled to all of the individual economic loss award.

### Collateral Offsets as Applied to the Estate's Non-Economic Loss Award

■ {28} As for the $250,000 in non-economic losses awarded to the Estate, we apply each individual's collateral offsets to that individual's share. As previously discussed, Joshua is entitled to three-quarters of the Estate's $250,000 non-economic loss award, or $187,500, pursuant to New Mexico intestacy statutes. Section 45–2–102(A)(2). Joshua's collateral benefits of $17,500 reduce his total share to $170,000. Rebecca's collateral benefits of $1,012,321 entirely eliminate her share of the non-economic loss to the Estate.

### Rebecca's and Trae's Non-Economic Loss Awards

■ {29} While we agree with Joshua that Rebecca's collateral benefits should be offset against her share of the economic loss award, reducing it to zero, we disagree that those offsets apply to Rebecca's personal non-economic loss award. Rebecca's award of

$100,000 in non-economic "presumed" damages was a fixed amount set by federal regulation for spouses of deceased victims. 28 C.F.R. § 104.44 ("The presumed non-economic losses for decedents shall be ... $100,000 for the spouse and each dependent of the deceased victim."). That portion of the award served to compensate Rebecca for her pain and suffering as well as loss of consortium resulting from Alfred's death. *See* Air Stabilization Act, 115 Stat. 237 § 402(7) (defining "noneconomic losses"). Such damages are personal to Rebecca and do not come at Joshua's expense; they would not have been part of the overall award if Joshua had been the only beneficiary who sought compensation from the Fund. Thus, they do not detract unfairly from what Joshua would have otherwise been entitled to receive if not for Rebecca. The same is true for the $100,000 awarded to Trae as Alfred's dependent. Therefore, we hold that the $100,000 in non-economic losses awarded by the Special Master individually to both Rebecca and Trae (a total of $200,000) is not subject to offset for collateral benefits. Each is entitled to $100,000 from the total award.

### Summary of the Award

{30} For the reasons stated, Rebecca and Trae each receive $100,000 not subject to offsets. From the final Fund award of $769,971.88, that leaves $569,971.88. As previously explained, Rebecca's collateral benefits caused the final award from the Special Master to be reduced dramatically, thereby causing Joshua's share to be substantially smaller. Therefore, the entire balance of the award, or $569,971.88, is awarded to Joshua.

### Joshua's Claims Against Rebecca for Fraud, Malfeasance, or Accounting

■ {31} Joshua also appeals the district court's grant of summary judgment on his claims of malfeasance, fraud, and request for accounting. These claims challenge Rebecca's conduct as Personal Representative in connection with the division of Alfred's assets other than the Fund, specifically, certain insurance proceeds and real estate that was Alfred's separate property. The Court of Appeals affirmed the summary judgment,

finding that Joshua's allegations were time-barred, and that there was no basis for any claims against Rebecca for fraud, malfeasance, or an accounting, either individually or as personal representative of the estate. *Marchand*, 2007–NMCA–138, ¶¶ 29–32, 142 N.M. 795, 171 P.3d 309. We agree with the Court of Appeals and affirm the district court's summary judgment with respect to Joshua's claims of fraud, malfeasance, or accounting.

{32} Rule 12–201(A)(2) NMRA required that Joshua file an appeal within thirty days of the Probate Court's December 5, 2003 Order ("A notice of appeal shall be filed ... within thirty (30) days after the judgment or order appealed from is filed in the district court clerk's office"). Joshua neither appealed the Order, nor pursued a claim of breach of fiduciary duty within the prescribed statutory period. Joshua argues that Rebecca's reappointment as Personal Representative for the purposes of administering the Fund award should restart the statute of limitations. We find no merit in this argument. Joshua's claims pertain to issues decided in the original probate proceedings that were resolved in the Order of Complete Settlement and Discharge of Representative. The limitations period for challenging that Order expired prior to the reinstatement of Rebecca as Personal Representative for purposes of distributing the Fund award. We will not start an entirely new limitations period, triggered by the reopening of the probate to address the Fund award, for Joshua to raise claims entirely unrelated to the Fund award—claims that he failed to raise during the limitations period triggered by closure of the original probate proceedings.

{33} We also agree with the Court of Appeals that the record does not support Joshua's contentions that Rebecca improperly or fraudulently took money received from the Fund so as to lift the six-month statute of limitations for pursuing a breach of fiduciary duty claim against a personal representative under NMSA 1978, § 45–3–1005 (1975). We affirm the district court's denial of Joshua's claims for fraud, malfeasance or accounting, and we refer the parties to the opinion of the Court of Appeals for a more thorough discus-sion of the record as it relates to this issue. *See Marchand*, 2007–NMCA–138, ¶¶ 31–32, 142 N.M. 795, 171 P.3d 309.

## CONCLUSION

{34} For the foregoing reasons, we reverse the Court of Appeals with respect to the application of collateral offsets. We affirm the Court of Appeals on all other matters. The case is remanded for proceedings consistent with this opinion.

{35} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA, PETRA JIMENEZ MAES, and CHARLES W. DANIELS, Justices.