# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2010-NMSC-009

Filing Date: March 4, 2010

Docket No. 31,013

QUYNH TRUONG, ARMIE SY, MIRANDA
DANIELE, WARREN HOPPER, SANDRA
MARTINEZ, and MICHAEL MARTINEZ,

       Plaintiffs-Petitioners,

v.

ALLSTATE INSURANCE COMPANY, a
foreign corporation, SUSAN CARY, and
JOHN DOES 1-500,

       Defendants-Respondents,

and

COMPUTER SCIENCES CORPORATION,

       Intervenor.

ORIGINAL PROCEEDING ON CERTIORARI
Linda M. Vanzi, District Judge

Morgan & Macy, Attorneys, Ltd.
Ron Morgan
Edwin E. Macy
Albuquerque, NM

Whitney Buchanan, P.C.
Whitney Buchanan
Albuquerque, NM

Parry, Deering, Futscher & Sparks, P.S.C.
Ron Parry
Covington, KY

for Petitioners

1

Modrall, Sperling, Roehl, Harris & Sisk, P.A.
Lisa Mann
Jennifer A. Noya
Albuquerque, NM

Steptoe & Johnson L.L.P.
Jon T. Neumann
Bennett Evan Cooper
Floyd P. Bienstock
Phoenix, NM

for Respondents

Sutin, Thayer & Browne
Jay D. Hertz
Albuquerque, NM

for Intervenor

Sanders & Westbrook, P.C.
Maureen A. Sanders
Albuquerque, NM

for Amicus Curiae
Insurance Division of New Mexico Public Regulation Commission

Miller Stratvert, P.A.
Ruth Fuess
Kelsey D. Green
Albuquerque, NM

for Amicus Curiae
Property Casualty Insurers Association of America

Gary K. King, Attorney General
Karen J. Meyers, Assistant Attorney General
Stephen Vigil, Assistant Attorney General
Nanette E. Erdman, Assistant Attorney General
Santa Fe, NM

for Amicus Curiae
Attorney General of New Mexico

## OPINION

**DANIELS, Justice.**

**{1}** In this class action case, we are asked to determine the applicability of an exemption to the Unfair Practices Act (UPA), NMSA 1978, Sections 57-12-1 to -22 (1967, as amended through 1999), that bars UPA suits based on "actions or transactions *expressly permitted* under laws administered by a regulatory body of New Mexico." Section 57-12-7 (emphasis added).

**{2}** Plaintiffs, a certified class of Allstate insureds, alleged in their complaint that Allstate had violated the UPA by using claims processing computer programs (hereinafter collectively referred to as "Colossus") that were programmed to underestimate and underpay their insurance claims below their true value. The district court agreed with Allstate's defense that the UPA claim was barred because the New Mexico Public Regulation Commission's (NMPRC) Superintendent of Insurance had "expressly permitted" its use of Colossus by adopting an independent market conduct examination (MCE) that spot-checked and noted no objections to Allstate's general claims handling practices within the historical period in which the class members' claims had arisen.

**{3}** We hold that the MCE did not create the kind of express permission that would exempt Allstate's challenged conduct from UPA scrutiny. We therefore reverse the district court's partial judgment barring Plaintiffs' claims.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**{4}** Plaintiffs filed a class action suit against Allstate in April 1999, alleging that Allstate's use of Colossus systematically devalued and underpaid their claims. The district court defined the class as "Allstate vehicular policy beneficiaries who made claims in New Mexico from 1995 forward, after the implementation and use of [Allstate's Claims Core Process Redesign (CCPR)]." Colossus was an integral part of CCPR as a claim evaluation tool. The district court ordered that the class should proceed under one common issue of liability: "Did Allstate breach its duty to their first party insured by delegating adjustment to [Colossus]?" The Court of Appeals exercised its discretion under Rule 1-023(F) NMRA to deny Allstate's application for interlocutory appellate review of the class certification order, and this Court denied certiorari. *Truong v. Allstate*, 2004-NMCERT-001, 135 N.M. 160, 85 P.3d 802.

**{5}** Four months after Plaintiffs' complaint was filed and unbeknownst to Plaintiffs, their counsel, or the district court, the Superintendent initiated an MCE to analyze Allstate's general claims handling processes in cases that had been processed from 1997 through 1999. The MCE process is one of the statutory tools the Superintendent uses to oversee the conduct of insurance companies:

> For the purpose of determining financial condition, fulfillment of contractual obligations, methods of doing business, treatment accorded policyholders, and compliance with law, the superintendent shall, as often as he deems advisable, examine or investigate the affairs, transactions, accounts, records and assets of each authorized insurer . . . . Except as expressly otherwise

3

provided, the superintendent shall so examine each domestic insurer not less frequently than every five years.

NMSA 1978, § 59A-4-5 (1993).

**{6}** The MCE applied two standards relevant to our inquiry in the process of assessing Allstate's conduct. The first standard was G6, employed to review whether "[c]laims are properly handled in accordance with policy provisions and applicable statutes, rules and regulations." The second standard was G13, reviewing claims handling practices to detect whether they "compel claimants to institute litigation, in cases of clear liability and coverage, to recover amounts due under policies by offering substantially less than is due under the policy." The MCE detected nothing objectionable in Allstate's claims handling, including with respect to the G6 and G13 standards. The observations relating to the G6 and G13 standards were:

> *Observations* [on G6]: Random samples of Closed Paid Claims, Claims Open as [of] 12/21/99, and Litigated Claims were selected and reviewed. All appropriate factors appear to have been handled. No exceptions were noted.
>
> . . . .
>
> *Observations* [on G13]: All Litigated Claim files sampled were reviewed under this standard. There were no cases where claimants appeared to be compelled to institute litigation in order to recover amounts due under policies because the Company was offering substantially less than is due under the policy. Demand amounts were compared with claim results and no trends were noted to suggest inappropriate settlement tactics.

**{7}** Although the MCE never specifically mentioned the Colossus program or its manner of use, the reviewed samples included at least forty-eight claims that had involved Colossus calculations as a part of the claims handling process. In December 2002, over three years after this suit began, the Superintendent ultimately adopted the MCE by signing a certificate which stated in its entirety:

> I, Eric P. Serna, Superintendent of Insurance of the State of New Mexico, do hereby certify that the attached Market Conduct Examination report for the period ending May 31, 2000 on:
>
> Allstate Insurance Company
> Allstate Indemnity Company
> Allstate Property & Casualty Insurance Company
>
> Was recently completed by Donald P. Koch, Examiner In Charge with the Insurance Division.
>
> Due consideration has been given to the comments of the Examiner regarding

4

the business affairs as reflected in this report.

The report as of this date is hereby adopted, filed and made an official record of the Division.

**{8}** After the MCE had been conducted, Allstate disclosed to Plaintiffs' counsel and the district court that it had occurred and filed a motion for summary judgment. In essence, Allstate argued that because the MCE detected no objectionable claims handling processes in the sample of cases reviewed, including a number of files in which Colossus had in fact been used by Allstate, the Superintendent thereby "expressly permitted" the use of Colossus. The district court initially denied Allstate's summary judgment motion, finding disputed factual issues regarding the scope of the MCE and any approval or permission by the Superintendent.

**{9}** In contemplation of an interlocutory appeal from the denial of summary judgment, Allstate filed a motion entitled, "Allstate Insurance Company's Acceptance of the Court's Offer of an Evidentiary Hearing on Defendant Allstate Insurance Company's Motion for Summary Judgment and Request for Modification of the Court's July 23, 2003 Order." Plaintiffs objected on the ground the "evidentiary hearing would [have] invade[d] the rights . . . to a jury trial." Not receiving a ruling on the motion, Allstate submitted an application for interlocutory appeal, which was denied.

**{10}** Allstate then renewed its motion for a hearing, to which Plaintiffs again objected. Plaintiffs argued that Allstate was trying to "repeat its effort at obtaining summary judgment by crafting a phase of litigation that would involve" a hearing with factfinding and that such a "hearing [would be] antithetical to an entitlement to summary judgment." Allstate explained to the district court that it was not requesting a reconsideration of summary judgment but instead was merely attempting to "create a complete and proper record . . . [for the] Court of Appeals" and "to provide clear guidance to the parties regarding the issues that need to be addressed at trial."

**{11}** The district court ultimately decided to hold an evidentiary hearing to resolve issues about "what the superintendent did or didn't authorize," which the court characterized as "issues that I think are legal and should be decided by the Court." The court accordingly conducted a three-day evidentiary hearing, at which it considered numerous documents and expert witnesses. In addition to live testimony, the court considered the deposition testimony of Donald Koch, the outside contractor who had supervised the MCE and authored the report ultimately adopted by the Superintendent. Both parties have pointed to different statements by Mr. Koch in support of their positions in this litigation.

**{12}** The district court had previously been presented with Mr. Koch's affidavit asserting that the MCE report prepared by him did not "exonerate" Allstate's use of Colossus and that "whether the right amount was paid on any claim was not tested and this process is left to the court system." In response to questioning by Plaintiffs, Mr. Koch further testified that he did not know how Colossus calculated damages on a claim, nor the source of information used to program its software, nor whether Colossus determined the appropriate value of a

5

claim. In response to the latter question, he responded that the NMPRC did not "supplant our view of what the number should be [for] what the company comes up with through whatever tools it uses, so that's not typically something that we would check unless there was some flag that said you better look at this." Mr. Koch testified that, had he been aware of the pendency of the Truong litigation, he would have avoided reviewing any files that were involved in the suit.

**{13}** In response to questions from Allstate, Mr. Koch testified that, although he had not reviewed the Colossus process and did not examine whether it was "giving the right amounts," he was aware of its existence, had reviewed the manuals provided him by Allstate "to determine . . . whether or not there was anything in there that tripped our concerns and triggers," and possessed "at least an understanding of the system." When asked whether he had reached a conclusion about the propriety of its use in settling claims, he responded: "No, we didn't. We had nothing before us to suggest that there was a problem or a concern, so in and of itself, it wouldn't have generated that kind of concern." He agreed that his review of the sampling of Allstate's claims files did not find any evidence that Allstate's valuations were too low, or any "flags that say something is not right with the system."

**{14}** The district court entered findings and conclusions in Allstate's favor, determining that

> Because the [MCE], adopted, issued, and filed by the [Superintendent] found that Allstate's CCPR claim handling practices, including its use of Colossus as a tool in adjusting claims, complied with policy provisions and New Mexico law, and adopted the "Pass" grades on all of the claim handling standards, the Superintendent has permitted Allstate to continue using Colossus in New Mexico and the [UPA] exemption operates to bar the class claim . . . .

**{15}** Prior to entry of judgment, Plaintiffs sought to take the oral deposition of the Superintendent, who successfully invoked executive privilege to prevent questioning about his thought processes and intentions with regard to the MCE. Plaintiffs were allowed instead to submit written questions regarding whether the Superintendent had expressly permitted Allstate to use Colossus. The Superintendent responded in writing that the MCE "'speaks for itself' . . . and never mentions the terms 'express permission' or 'Colossus'"; that the "legal interpretation" of the MCE "in a private right of action is a question for the [court]"; and that MCEs "do not review the amount of damages and whether the final settled amount is appropriate or not," leaving those matters to be "negotiated or disputed in a Court of Law between the insurer and the insured." The district court denied Plaintiffs' pre-judgment motion to reconsider its findings and conclusions in light of the Superintendent's answers.

**{16}** Following entry of the judgment dismissing the individual and class claims based on Allstate's use of Colossus, Plaintiffs unsuccessfully sought to have the court consider a new letter from the Superintendent, dated two days after the court denied the Plaintiffs' motion for reconsideration based on the Superintendent's written deposition answers. In the new letter, the Superintendent directly answered for the first time the ultimate question that had

6

earlier been posed by the Plaintiffs, stating that his adoption of the MCE "did <u>not</u> 'expressly' permit Allstate to use . . . and should not be construed as an 'express' permission for Allstate to use . . . 'Colossus,' as it was not the focus of the examination." By the time this motion was heard, the original district court judge had retired, and his successor denied the motion and let the judgment stand.

{17}   Plaintiffs appealed the district court's ruling to the Court of Appeals, where a divided panel affirmed the district court. *Truong v. Allstate Ins. Co.*, 2008-NMCA-051, 143 N.M. 831, 182 P.2d 814. The majority opinion considered the statutory term "expressly permitted" to be unclear on its face. *Id.* ¶ 32. In addressing the first impression issue of the relationship between the statutory term and a targeted examination by a regulatory agency, the Court ultimately thought it necessary to create a new three-part test to determine when an adoption of a targeted examination will constitute "express permission" under Section 57-12-7:

> We hold that a regulatory agency expressly permits an action or transaction . . . where: (1) the agency conducts a targeted examination of the defendant's broader conduct, (2) included in that examination is an explicit consideration of the specific action or transaction that allegedly violates the UPA, and (3) the agency explicitly approves the broader conduct in an official report.

*Truong*, 2008-NMCA-051, ¶ 47.

{18}   In applying its new test, the Court of Appeals determined that, although the evidence was in conflict as to whether the MCE author or the Superintendent had intended to approve Allstate's challenged use of Colossus, the district court's factual findings regarding what the regulatory body had or had not permitted required a substantial evidence review "in the light most favorable to Allstate." *Id.* ¶ 50. Applying that deferential mode of review, the Court decided there was sufficient evidence to support the district court's finding that the MCE conducted on Allstate's claims handling processes had "considered Colossus closely enough such that their approval of Allstate's overall claim handling processes could reasonably be said to include Allstate's use of Colossus," thereby barring Plaintiffs' UPA claims. *Id.*

{19}   A two-judge majority also held that the district court properly made findings of disputed fact without the assistance of a jury on the issue of what conduct the Superintendent had expressly permitted, on the theory that Plaintiffs waived their right to a jury trial. *Id.* ¶¶ 23-25.

{20}   This Court granted Plaintiffs' petition for writ of certiorari pursuant to NMSA 1978, Section 34-5-14(B)(4) (1972), which provides that the Supreme Court has jurisdiction to review a Court of Appeals decision that "involves an issue of substantial public interest" and Rule 12-502 NMRA, the rule that "governs petitions for the issuance of writs of certiorari seeking review of decisions of the Court of Appeals."

{21}   Following oral argument and because of exigencies unrelated to the issues addressed here, this Court entered an order of reversal, determining that the courts below erred in their

conclusions that the Superintendent had expressly permitted the challenged use of Colossus. In that order, we also noted that this Court would subsequently issue this formal published Opinion detailing the reasoning underlying our order of reversal and remand.

## II.    DISCUSSION

### A.    Standard of Review

**{22}**    The UPA, in Sections 57-12-3 and 57-12-10, provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices. The resolution of this case hinges on the interpretation and application of a statutory exemption to those consumer protections:

> Nothing in the Unfair Practices Act shall apply to actions or transactions *expressly permitted* under laws administered by a regulatory body of New Mexico or the United States, but all actions or transactions forbidden by the regulatory body, *and about which the regulatory body remains silent*, are subject to the Unfair Practices Act.

Section 57-12-7 (emphasis added). There are two issues regarding the appropriate standard of appellate review of the trial court's findings and conclusions. The first focuses on our review of the lower courts' interpretations of the statutory language itself. That standard of review requires no extended discussion. There is no question that the "meaning of language used in a statute is a question of law that we review de novo." *Cooper v. Chevron U.S.A., Inc.*, 2002-NMSC-020, ¶ 16, 132 N.M. 382, 49 P.3d 61.

**{23}**    The second issue focuses on the proper standard of review of the district court's determination that the Superintendent had expressly permitted Allstate's use of Colossus in a manner that would create a statutory exemption to the coverage of the UPA. The Court of Appeals saw this as a factual, rather than a legal, issue and applied a substantial evidence standard of review. *Truong*, 2008-NMCA-051, ¶ 50. By applying that standard, the Court had to disregard the conflicting testimony of the author of the MCE that his report had neither focused on Colossus nor been intended to expressly exonerate Allstate for using it, as well as the Superintendent's post-hearing letter stating that he had not expressly permitted Allstate's use of Colossus. With respect to the thoughtful and thorough effort of the Court of Appeals to resolve the difficult issues in this case, we must hold otherwise.

**{24}**    When a governmental agency exercises its authority under the statute to grant an express exemption for conduct that may otherwise be within the scope of a statute's prohibitions, it is making law, pursuant to the Legislature's recognized power to grant "agencies the discretion of promulgating rules and regulations which have the force of law." *City of Albuquerque v. N.M. Pub. Regulation Comm'n*, 2003-NMSC-028, ¶ 16, 134 N.M. 472, 79 P.3d 297 (internal quotation marks and citations omitted) (interpreting tariff approved by the NMPRC). And a court's "interpretation of an administrative regulation is a question of law that we review de novo." *State v. Willie*, 2009-NMSC-037, ¶ 9, 146 N.M. 481, 212 P.3d 369 (construing scope of a regulation promulgated by the Scientific

8

Laboratory Division of the Department of Health); *see also Marchand v. Marchand*, 2008-NMSC-065, ¶ 19, 145 N.M. 378, 199 P.3d 281(holding that the interpretation of federal regulations and the interpretation of a letter written by a Special Master pursuant to statutory authority were "matters of law that are subject to de novo review").

**{25}** To the extent that reviewing an agency's actions and accompanying intentions that may have the effect of creating a rule of law can be considered a reconstruction of factual occurrences, those historical events are legislative facts, and not adjudicative facts.

> Unlike adjudicative facts, legislative facts do not concern individual parties, such as who did what, when, where, and how. . . . Legislative facts are those which help the tribunal to determine the content of law and policy and to exercise its judgment or discretion in determining what course of action to take.

*Lee v. Martinez*, 2004-NMSC-027, ¶ 13, 136 N.M. 166, 96 P.3d 291 (internal quotation marks and citations omitted) (concluding that a judge's findings of fact made after taking testimony relating to a legal issue were "legislative in nature" and must be reviewed de novo by this Court); *see also Trujillo v. City of Albuquerque*, 110 N.M. 621, 636, 798 P.2d 571, 586 (1990) (Montgomery, J., concurring in part and dissenting in part) ("It would be inappropriate, however, for a trial court to 'find' the legislative facts leading to a ruling on a question of law."), *overruled in later appeal on other grounds by Trujillo v. City of Albuquerque*, 1998-NMSC-031, 125 N.M. 721, 965 P.2d 305.

**{26}** In determining legislative facts, we therefore consider both evidentiary and non-evidentiary sources. "'The usual resort, however, for ascertainment of legislative facts is not through formal proof by sworn witnesses and authenticated documents but by the process of judicial notice.'" *Trujillo*, 110 N.M. at 635, 798 P.2d at 585 (quoting Charles T. McCormick, *Judicial Notice*, 5 Vand. L. Rev. 296 (1952)). "[T]his Court—or any court, trial or appellate—may take judicial notice of legislative facts by resorting to whatever materials it may have at its disposal establishing or tending to establish those facts." *Id.* at 636, 798 P.2d at 586. And although it is not conclusive on the issues, this would include the letter of the Superintendent stating that he has not "expressly permitted" Allstate's challenged use of Colossus.

**{27}** Not only is a de novo review of the legal effect of the MCE required by our caselaw, it is eminently reasonable. It would be jurisprudentially unsound to apply a substantial evidence review, as would be appropriate for case-specific litigated facts, to the question of whether the Superintendent or his agents had created a statutory exemption for Allstate's, or anyone else's, use of Colossus. To do so would leave the identical question to be repeatedly relitigated, with the possibility of disparate and conflicting results in each new case, with future plaintiffs or defendants not being bound, or even Allstate protected, by the factual determinations made by the district judge in this case, and with the possibility of other carriers not being found in a future case to be exempted for their identical conduct. The question whether the Superintendent has created a statutory exemption must be viewed as a matter of law. We "review these questions of law de novo, without deference to the

9

district court's legal conclusions." *Primetime Hospitality, Inc. v. City of Albuquerque*, 2009-NMSC-011, ¶ 10, 146 N.M. 1, 206 P.3d 112.

**{28}**   We therefore turn to a de novo interpretation of the statutory language through established New Mexico principles of statutory construction and a de novo determination as to whether the MCE in this case created an exemption to the UPA.

**B.       General Statutory Construction Guidelines**

**{29}**   We begin with a consideration of recognized principles of statutory interpretation that are relevant to our inquiry in this case.  Perhaps the most basic principle is that "[i]t is the high duty and responsibility of the judicial branch of government to facilitate and promote the legislature's accomplishment of its purpose." *State v. Smith*, 2004-NMSC-032, ¶ 8, 136 N.M. 372, 98 P.3d 1022 (internal quotation marks and citations omitted).

**{30}**   In the UPA, the Legislature has provided for damages and other remedial relief for persons damaged by unfair, deceptive, and unconscionable trade practices.  Sections 57-12-3, -10.  Since the UPA constitutes remedial legislation, "we interpret the provisions of this Act liberally to facilitate and accomplish its purposes and intent." *State ex rel. Stratton v. Gurley Motor Co.*, 105 N.M. 803, 808, 737 P.2d 1180, 1185 (Ct. App. 1987) (rejecting UPA exemption argument); *see Ashlock v. Sunwest Bank of Roswell, N.A.*, 107 N.M. 100, 102, 753 P.2d 346, 348 (1988)  ("[W]e ensure that the Unfair Practices Act lends the protection of its broad application to innocent consumers."), *overruled on other grounds by Gonzales v. Surgidev Corp.*, 120 N.M. 133, 899 P.2d 576 (1995).

**{31}**   Section 57-12-7, on the other hand, creates an exception to the general protections of the UPA.  When "resolving statutory ambiguities, courts will favor a general provision over an exception. . . .  This is especially true when a statute promotes the public welfare." *Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998-NMSC-020, ¶ 27, 125 N.M. 401, 962 P.2d 1236 (citation omitted).

**{32}**   The exemption embodied in Section 57-12-7 also reflects important purposes that must be respected.  The first is to give deference to the expertise of the relevant regulatory body.  "When an agency that is governed by a particular statute construes or applies that statute, the court will begin by according some deference to the agency's interpretation." *Morningstar Water Users Ass'n v. N.M. Pub. Util. Comm'n*, 120 N.M. 579, 583, 904 P.2d 28, 32 (1995).  When the Superintendent, with both expertise and authority in insurance matters, makes and expressly articulates a lawful decision to permit an insurer's conduct, the judicial branch should respect the Superintendent's authority to do so.  Another relevant consideration is that it would be fundamentally unfair to penalize regulated entities who have conformed their conduct to the express directives of their governing regulatory body.  "[A] business [should] not [be] subjected to a lawsuit under the Act when it does something required by law, or does something that would otherwise be a violation of the Act, but which is allowed under other statutes or regulations." *Skinner v. Steele*, 730 S.W.2d 335, 337 (Tenn. Ct. App. 1987) (construing an exemption to the Tennessee Consumer Protection Act: "The provisions of this chapter shall not apply to: (a) Acts or transactions *required or*

10

*specifically authorized* under the laws administered by or rules and regulations promulgated by, any regulatory bodies or officers acting under the authority of this state or of the United States" (internal quotation marks omitted)).

{33}    With these general interpretive principles in mind, we "consider the statute's history and background" insofar as it may help to "give effect to the Legislature's intent" and aid us in construing the statutory exemption and applying it in this case. *Key v. Chrysler Motors Corp.*, 121 N.M. 764, 768-69, 918 P.2d 350, 354-55 (1996).

## C.    Statutory History

{34}    When New Mexico's UPA was first enacted in 1967, it defined its agency exemption as including "actions or transactions permitted under laws administered by a regulatory body of the state of New Mexico or the United States."  1967 N.M. Laws, ch. 268, § 6.  Despite that earlier statute's use of relatively general language to describe the exemption, New Mexico courts recognized that it should not be read so expansively as to negate the remedial consumer protection purposes of the UPA.  *See Stratton*, 105 N.M. at 807, 737 P.2d at 1184 (rejecting an argument that a kickback arrangement between a car dealer and an automobile insurance carrier was exempted from a UPA suit as a result of the Superintendent's authority to regulate the insurance industry); *Ashlock*, 107 N.M. at 102, 753 P.2d at 348 (declining to hold that a bank's practices were exempt as a result of the pervasive federal regulatory examination scheme).

{35}    In contrast to the New Mexico appellate courts, some federal judges have interpreted New Mexico's exemption language more broadly.  Although *Campos v. Brooksbank*, 120 F. Supp. 2d 1271, 1276 (D.N.M. 2000), held consistently with the New Mexico precedent that the exemption does not apply unless "the specific activity which would otherwise constitute a violation of the Unfair Trade Practices Act is in fact 'permitted' by the applicable law or regulation," the court noted that other federal district judges were applying the statute in a different way.  The court noted two unpublished memorandum decisions filed in 1993 and 1997, in which other judges determined that regulated activities would be entitled to an exemption, even if the specific challenged activity had not been directly addressed by the regulating agency.  *Id.*

{36}    In 1999, the New Mexico Legislature significantly narrowed the language describing the regulatory exemption in Section 57-12-7 by inserting the limiting term "expressly" before the term "permitted" and by adding the new phrase, "but all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the Unfair Practices Act."  1999 N.M. Laws, ch. 171, § 2.  In our statutory construction, we must give effect to those changes.  "This Court has long held that we must avoid constructions of statutory amendments that would render the change unnecessary and meaningless."  *State v. Nick R.*, 2009-NMSC-050, ¶ 28, 147 N.M. 182, 218 P.3d 868 (internal quotation marks and citation omitted).  We therefore turn to a plain meaning analysis of the current wording of the statute, as amended in 1999, before the MCE in this case was conducted.

11

**D.      Plain Meaning Analysis**

**{37}**    "The first and most obvious guide to statutory interpretation is the wording of the statutes themselves." *DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 29, 146 N.M. 453, 212 P.3d 341.  In the Uniform Statute and Rule Construction Act, the Legislature has mandated that "[t]he text of a statute or rule is the primary, essential source of its meaning." NMSA 1978, § 12-2A-19 (1997).  New Mexico courts have long honored this statutory command through application of the plain meaning rule, recognizing that "[w]hen a statute contains language which is clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *State v. Jonathan M.*, 109 N.M. 789, 790, 791 P.2d 64, 65 (1990).  In order to construe faithfully what the Legislature meant by the terms "expressly permitted" and "all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the Unfair Practices Act," Section 57-12-7, we consider the plain meaning of the words used in the context of the statutory text as a whole.

### 1.      "Expressly" Defined and Applied

**{38}**    "Expressly" means "in direct or unmistakable terms:  in an express manner." Webster's Third New International Dictionary 803 (1976).  "Express" is defined as "directly and distinctly stated or expressed *rather than implied or left to inference*:  not dubious or ambiguous: definite, clear, explicit, unmistakable."  *Id.* (emphasis added).  By contrast, to "imply" is "to indicate or call for recognition of as existent, present, or related *not by express statement* but by logical inference or association or necessary consequence."  *Id.* at 1135 (emphasis added).   "Inference" is defined as "the act of passing from one or more propositions [or] statements . . . considered as true to another the truth of which is believed to follow from that of the former."  *Id.* at 1158.

**{39}**    Applying the plain meaning of the statutory term "expressly," we can find no express statement in the MCE, the Superintendent's certificate of adoption, or any other document generated by the Division of Insurance in connection with the MCE that refers to Colossus in any manner whatsoever, and certainly none purporting to "expressly permit" Allstate's use of it.  Not only is there no such express statement, both the author of the MCE and the Superintendent have represented that neither does the MCE speak to the use of Colossus nor was its adoption intended to provide express permission for its use.  Essentially, the gist of the express statements in the MCE was that "[a]ll appropriate factors *appear to have been* handled," that "[n]o exceptions *were noted*," that "[t]here were no cases where claimants *appeared to be compelled* to institute litigation," and that "no trends *were noted* to *suggest* inappropriate settlement tactics." (Emphasis added).  The certificate of the Superintendent accepting the MCE expressly states only that "[d]ue consideration has been given" to the report and that it was "adopted, filed and made an official record of the Division."

**{40}**    The fact that it took three days of testimony for the district court to infer a permission that was never articulated in any oral or written form should itself demonstrate that no permission was "expressly" given.  The Court of Appeals' affirmance did not rely on anything that was "directly and distinctly stated or expressed" by the Superintendent or

12

anyone else in the Division but was instead inferred from conduct and implications, which is by definition the antithesis of an express statement. The Court's newly created three-part test is essentially an imperfect syllogism, using a form of deductive reasoning that starts with a major premise ("the MCE approved Allstate's claims handling"), continues with a minor premise ("Allstate's claims handling involved the use of [Colossus]"), and arrives at a conclusion ("the MCE therefore approved Allstate's use of [Colossus]"). *See* Larry O. Natt Gantt, II, *Deconstructing Thinking Like a Lawyer: Analyzing the Cognitive Components of the Analytical Mind*, 29 Campbell L. Rev. 413, 462 (2007).

{41}    The most significant problem with using that kind of deductive reasoning in applying the statutory standard is that it is inconsistent with the definitional distinctions between "express" and "inferred" and fails to satisfy the plain meaning canon of statutory construction.

{42}    Moreover, even if "expressly permitted" somehow could be construed broadly enough to include the use of deductive reasoning to infer the granting of permission in the absence of an express statement, the syllogism in this case is fundamentally flawed. The Superintendent did not "approve" the claims handling processes that were surveyed in the MCE. The report adopted by the Superintendent was careful to state only that the claims "appear to" have been handled properly and that no claims handling abuses "were noted." This is not the same as an affirmative finding of proper handling. It is axiomatic in both science and law that "an absence of evidence is not evidence of absence." *Commonwealth v. Heilman*, 867 A.2d 542, 547 (Pa. Super. Ct. 2005) (observing that the failure to detect a defendant's DNA at the crime scene would not establish that he had not participated in the crime). To conclude as a matter of law that the Superintendent "expressly" permitted all aspects of Allstate's claims handling surveyed in an MCE that did not detect any apparent problems would negate every policyholder's rights to pursue any UPA remedies for claims handling abuses of all kinds during the same period, as well as similar claims handling behavior before and after that period. We decline to equate an agency's failure to detect potentially unfair trade practices in a market conduct examination with a conclusion of law that the agency has "expressly" permitted the challenged practices and exempted them from the protections of the UPA.

## 2.    "Permitted" Defined and Applied

{43}    The retrospective three-part inferential test is also inconsistent with the plain meaning of the verb "permit." To "permit" is "to consent to expressly or formally." Webster's Third New International Dictionary, *supra* at 1683 (explaining that "permit" is derived from the Latin word "permittere," defined as "to let through, allow, permit," and which is itself a combination of two Latin roots, "per," which means "through," and "mittere," which means "to let go, send"). Allstate claims that it was given "permission" to use Colossus between 1995 and 1999 as a result of the Superintendent's adoption of the MCE, which occurred after the events in question in the present case and after the filing of this suit to challenge the lawfulness of those events. In doing so, Allstate essentially argues for a retroactive grant of permission. This approach is contrary to the plain meaning of "permitted" and ignores the important distinctions between obtaining permission and seeking

13

forgiveness. *See Lowry v. McDonnell Douglas Corp.*, 211 F.3d 457, 462 n.5 (8th Cir. 2000) (rejecting late filing of notice of appeal, and emphasizing difference between seeking "permission to file late" and seeking "forgiveness for having filed late").

{44}    Allstate and amicus Property Casualty Insurers Association of America (PCIAA) have stressed in their briefing that insurers must "be able to rely on the Superintendent to determine whether their conduct conforms to policy provisions and New Mexico law," "without risk that such reliance [might] expose them to tort liability." The flaw in this argument is that Allstate did not rely on any communication by the Superintendent when it used Colossus during the relevant time periods of the conduct challenged in Plaintiffs' lawsuit. If it had, this argument would be entitled to substantial weight in applying the statutory exemption for conduct that has been undertaken in reliance on express permission granted by an agency with lawful authority. This only serves to emphasize the importance of construing "permitted" according to its plain pre-conduct meaning and of not confusing it with post-conduct forgiveness.

### 3.    "About Which the Regulatory Body Remains Silent" Defined and Applied

{45}    Not only did the Legislature add the limiting term "expressly" before "permitted" in the 1999 amendments, it further expressed its intent by adding the completely new clarifying phrase, "but all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the Unfair Practices Act." Section 57-12-7. This appears on its face to emphasize the requirement that before a statutory exemption will be created, an agency must give express, and not implicit, permission to engage in the allegedly exempted conduct. In this case, the Superintendent responded to written questions about the effect of his MCE by saying what was obvious on the face of the filed document, that the MCE spoke for itself and never mentioned either Colossus or any express grant of permission to use it. In the plain meaning of the statute, the MCE remained silent on the question whether the regulatory body was giving permission for Allstate to use Colossus, as the Superintendent emphasized in both his written discovery answers and in his post-judgment letter emphasizing that he had not given express permission.

### E.    New Mexico Caselaw Interpreting the Amended Statute

{46}    The two New Mexico cases that have interpreted the effect of the amended statute are *Valdez v. State*, 2002-NMSC-028, 132 N.M. 667, 54 P.3d 71, and *Azar v. Prudential Insurance Co. of America*, 2003-NMCA-062, 133 N.M. 669, 68 P.3d 909. Each case emphasizes that the language "expressly permitted" requires a narrower interpretation than the construction successfully urged by Allstate in the courts below.

{47}    *Valdez* involved a UPA claim challenging higher rates being charged for collect phone calls placed by prison inmates than for those placed by other persons. This Court held that the telephone service company's rates were exempt from claims under the UPA because the NMPRC, which was authorized to "fix, determine, supervise, regulate and control all charges and rates" of telephone companies in the state, specifically "exempted inmate

14

telephone services from" the coverage of the UPA. 2002-NMSC-028, ¶¶ 5, 8 (internal quotation marks and citation omitted). Applying the "filed rate doctrine," *Valdez* held that Section 57-12-7's exemption barred the UPA claims challenging the NMPRC-approved rates. 2002-NMSC-028, ¶ 5 ("The filed rate doctrine is a doctrine that allows for any 'filed rate'—that is, one approved by the governing regulatory agency—[to be] per se reasonable and unassailable in judicial proceedings brought by ratepayers." (internal quotation marks and citation omitted) (alteration in original))

**{48}** *Azar* was a case that, like this one, dealt with the interplay between the UPA exemption and the regulatory actions of the Insurance Division. *Azar* involved a UPA claim against an insurance company for failing to disclose additional charges for paying installment, or modal, premiums rather than a single annual premium. The defendant insurance company argued that the UPA exemption applied because "the Insurance Division expressly permitted the sale of . . . policies by approving the  policies, including the change of frequency clause, without requiring additional finance charge . . . disclosures." 2003-NMCA-062, ¶ 66 (internal quotation marks omitted). The insurer's reasoning—that because the policy forms were approved by the Division, and because those policy forms did not disclose modal premiums, then the Division "expressly permitted" the non-disclosures of modal premiums—is strikingly similar to the deductive argument made by Allstate here. The *Azar* Court rejected the UPA exemption argument, primarily on the determination that the Insurance Division's inferential approval was not express:

> [T]he Insurance Division has never specifically addressed the subject of modal premiums, and both the Insurance Code and the regulations are silent on the subject. Thus, it does not appear that the challenged activity—Prudential's non-disclosure of certain information regarding its modal premium practices— is "expressly permitted" by the Insurance Division. Accordingly, the regulatory defense set forth in Section 57-12-7 that would exclude transactions expressly permitted under New Mexico regulatory law does not apply.

*Id.* ¶ 68.

**{49}** The MCE at issue in this case was analogous in one significant respect to the approved policy forms in *Azar*. The MCE not only made no specific conclusions about the design or manner of use of Colossus, Colossus was not even mentioned in any of the MCE's results or observations.

**{50}** We note that in this case, the MCE had not been initiated, completed, or adopted before Allstate's challenged use of Colossus. In contrast, the regulatory body in *Valdez* specifically approved and accepted the rates at issue before they were charged. In *Azar*, the insurer claimed an exemption based on the Division's "prior approval" of policy forms pursuant to the requirement of NMSA 1978, Section 59A-18-14 (1987), that the Superintendent shall "approve any filed form or rate if he finds that it complies with the Insurance Code." Even with the prior filing, the *Azar* Court held that "the approval of a policy by a regulatory body does not conclusively establish the validity of the policy or

15

shield it from review by the courts." *Azar*, 2008-NMCA-062, ¶ 69.

**{51}**    A significant thread running through all New Mexico precedents applying Section 57-12-7, both before and after the 1999 amendments, is that only express pre-conduct permission, such as existed in *Valdez,* has been deemed sufficient to create a UPA exemption.  Neither inferential pre-conduct agency permission nor post-conduct agency review has ever been held to satisfy the requirement of the statute.

### F.    Caselaw From Other Jurisdictions

**{52}**    In the face of this New Mexico precedent, Allstate and amicus PCIAA urge us to apply judicial interpretations of differently-worded exemption statutes from other states, despite the acknowledgment that none of the cases construe statutes with the same language as New Mexico's Section 57-12-7.  In fact, the only other state with the term "expressly permitted" in its exemption statute is Indiana, and no case has yet construed the term.  Ind. Code. Ann. § 24-5-0.5-6 (West, Westlaw through 2009 1st Special Sess.).  Other states have differently-worded statutes and different precedential interpretations of their scope.  For example, Ga. Code Ann. § 10-1-396(1) (West, Westlaw through 2009), which exempts "[a]ctions or transactions specifically authorized" by a regulatory agency, has been broadly construed by the Georgia courts to exempt all consumer suits relating to insurance transactions because the insurance industry is regulated as a whole by the Georgia Insurance Commissioner.  *Ferguson v. United Ins. Co.*, 293 S.E.2d 736 (Ga. Ct. App. 1982).  *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 674 (N.D. Ga. 1983), explained that the Georgia statutory exemption for actions or transactions "specifically authorized" did not really mean "conduct that was specifically authorized," but meant instead "conduct that is being regulated by an administrative agency."

**{53}**    The Court of Appeals in this case correctly observed that "New Mexico has not taken the path of broad regulatory exemption based on the mere existence of a regulatory structure" that has been followed in a number of other states, like Georgia, with other statutory approaches.  *Truong*, 2008-NMCA-051, ¶ 43.  We are comfortable with the principled approach that has been recognized by our precedent, honoring the New Mexico Legislature's command by interpreting its statutory term "expressly permitted" as meaning "expressly permitted."

### G.    Primary Jurisdiction Distinguished

**{54}**    We emphasize that this case does not involve any application of the doctrine of primary jurisdiction, which would in this case necessarily create a nonexistent authority on the part of the Superintendent to adjudicate historical unfair practice disputes between carriers and consumers.    *See State ex rel. Regents of E. N.M. Univ. v. Baca*, 2008-NMSC-047, ¶ 15 n.1, 144 N.M. 530, 189 P.3d 663 (explaining that the doctrine of primary jurisdiction "is a prudential rule used by courts to allocate between courts and agencies the initial responsibility for resolving a dispute when their jurisdictions overlap") (internal quotation marks and citation omitted);*Valdez*, 2002-NMSC-028, ¶ 6 ("The primary jurisdiction doctrine is a doctrine by which courts that have jurisdiction defer to the expertise

16

of an administrative body.").

**{55}** *Summit Props., Inc. v. Pub. Serv. Co. of N.M.*, 2005-NMCA-090, 138 N.M. 208, 118 P.3d 716, rejected a primary jurisdiction argument in a UPA dispute between a utility and a customer over utility connection fees. The Court noted that the NMPRC's statutory power to "regulate and supervise" every public utility "does not preempt lawsuits involving contracts a utility enters into with private parties." *Id.* ¶ 11. Despite the fact that a cause of action is asserted against a regulated entity, "jurisdiction over contract or tort claims . . . usually rests with the courts" because the agency has no power to adjudicate individual disputes and award damages. *Id.*

**{56}** As the Superintendent and the Division emphasize in their amicus brief before this Court, the New Mexico statutes recognize shared responsibilities of the agency, of the Attorney General, and of the courts in regulating the conduct of insurance companies and seeking both preventative and remedial relief. The Superintendent, who has neither exercised nor attempted to exercise any authority to adjudicate individual disputes between insurers and carriers, does have the power to levy penalties, revoke certificates of authority, and seek injunctions against carriers under NMSA 1978, Sections 59A-1-18 (1989), 59A-2-8 (1984), 59A-5-26 (1997), and 59A-16-27 (1993). The Attorney General can seek injunctive relief, restitution, and civil penalties under Sections 57-12-8 and 57-12-10. And "a private plaintiff may pursue the remedies contained under Section 57-12-10 for unfair or deceptive trade practices, notwithstanding the statutory authority investing the superintendent of insurance with broad administrative powers under the Insurance Code." *Stratton*, 105 N.M. at 806-07, 737 P.2d at 1183-84. In this case, it is the courts, and not the Superintendent, who have jurisdiction over the UPA dispute between Plaintiffs and Allstate.

## H.    General and Specific Use Permission

**{57}** Even if this had been a case in which the Superintendent had expressly permitted the use of Colossus in some manner, Plaintiffs have argued throughout this litigation "that the use of a computer program to perform calculations is not unlawful in and of itself, but rather it is the manner in which Allstate uses the calculation in the adjustment process to effect a broad, systemic artificial reduction in claim payments that is unlawful."

**{58}** The *Azar* Court reaffirmed the proposition that the distinction between abstract usage and specific manner of use is a significant one. 2003-NMCA-062, ¶ 68 ("[T]he specific activity, *including the manner in which it was done*, must be expressly permitted to fall within [the] exemption." (emphasis added) (internal quotation marks and citation omitted)); *see also Ashlock*, 107 N.M. at 103, 753 P.2d at 349 (holding that although the specific activity, providing interest-bearing accounts, was regulated by the Board of Governors of the Federal Reserve System, the defendant bank was not exempted under Section 57-12-7 because "attention has not been directed to any federal statute or regulation that would evidence the intention of Congress or the federal regulatory branch to regulate, to any extent, the bank's failure to deliver goods or services as promised"); *Campos*, 120 F. Supp. 2d at 1276 (holding that for conduct to be exempted from the UPA, "the specific activity which would otherwise constitute a violation of the Unfair Trade Practices Act [must have been]

17

in fact 'permitted'").

**{59}** In short, even if the Superintendent had expressly permitted either the general use of Colossus in claims processing or any more specific uses of Colossus, short of comprehensive permission covering all of the allegations in Plaintiffs' UPA claim, issues regarding the manner of use or other matters not encompassed in the express permission would still go to the factfinder for resolution. In a jury trial, this would require jury instructions clarifying any exempted aspects of the UPA cause of action.

**{60}** Our de novo review of the relevant materials leads us to the conclusion that the Superintendent has not expressly given permission for Allstate's use of Colossus in any respect, including its particular manner of use as challenged in Plaintiffs' complaint. Because the Superintendent was silent as to any permission whatsoever regarding Colossus, the provisions of the exemption statute have no role in the litigation of Plaintiffs' UPA claims.

**I.      Express Permission Requires Clear Public Documentation**

**{61}** Given the uncertainty over the appropriate application of the UPA's exemption language that has marked the litigation in this case, it is necessary that we provide more explicit guidance for the future than would be furnished by merely stating that "expressly permitted" means "expressly permitted." For the exemption to apply in a transparent and unambiguous manner, it is important that it be communicated in a way that would give fair notice to all who may be affected by the resulting statutory exemption, including the regulators themselves, affected consumers, the particular industry involved, the public in general, litigants, and courts who must apply the exemption.

**{62}** Based on our analysis of the statutory history, the plain meaning of its language, the legislative purpose, and the practical realities, we agree with the amicus positions of the New Mexico Attorney General, the Insurance Division, and the Superintendent, that in order for an action or transaction to be deemed expressly permitted and thereby exempted from the coverage of the UPA, the permission must be within the authority of the Superintendent to grant and must be specifically articulated in some form of public document. As those amici point out, the approach urged by Allstate, of inferring express permission by analyzing non-public files and taking testimony from various persons involved in an agency's action, would instead leave everyone in uncertainty about whether any activity has or has not been exempted from the protections of the UPA. An explicit statement in a publicly filed document would have avoided those undesirable consequences in this case and hopefully will do so in future disputes over the existence and scope of a purported exemption based on express agency permission.

**J.      Jury Waiver Issue**

**{63}** One of the issues before us is whether the Court of Appeals majority erred in concluding that Plaintiffs had waived their right to have a jury decide what conduct the Superintendent had or had not exempted from the coverage of the UPA by a grant of express

18

permission. As a result of our determination that the question is a legal one for the courts to decide, as we have done in this opinion, and not a factual one for a jury or a judge sitting as factfinder, we need not address this moot issue.

## K.    Class Certification Issue

**{64}** Allstate also has pursued a conditional cross-appeal on the class certification issue, renewing its previously unsuccessful request for review of the class certification order. *Truong*, 2008-NMCA-051, ¶ 6. Because the Court of Appeals affirmed the district court's judgment dismissing the class action claims, it did not address Allstate's renewed assertion of its old class certification challenge. *Id.* There is nothing that has materially changed since the Court of Appeals and this Court previously declined Allstate's request for a discretionary mid-case review of the certification issue. *Salcido v. Farmers Ins. Exch.*, 2004-NMCA-006, 134 N.M. 797, 82 P.3d 968, sets forth the considerations that guide the courts in determining when to entertain interlocutory class certification appeals:

> (1) when there is a death-knell situation for either the plaintiff or defendant that is independent of the merits of the underlying claims, coupled with a class certification decision by the district court that is questionable, taking into account the district court's discretion over class certification; (2) when the certification decision presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review; and (3) when the district court's class certification decision is manifestly erroneous.

*Id.* ¶ 11.

**{65}** Applying *Salcido*, we decline to review the certification challenge at this time, without prejudice to Allstate's appellate rights after final judgment regarding the current certification or any modifications that may be made before the litigation is final.

## III.    CONCLUSION

**{66}** We hold that neither the conduct of the MCE nor its adoption by the Superintendent satisfied the "expressly permitted" requirement of the UPA exemption with respect to any aspect of Allstate's general or particularized use of Colossus. We have accordingly issued our mandate reversing the Court of Appeals, vacating the district court's partial judgment barring Plaintiffs' UPA claims, and remanding to the district court for further proceedings consistent with this Court's Opinion.

**{67}    IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR**:

19

_____

**EDWARD L. CHÁVEZ, Chief Justice**


_____

**PATRICIO M. SERNA, Justice**


_____

**PETRA JIMENEZ MAES, Justice**


_____

**RICHARD C. BOSSON, Justice**

**Topic Index for** *Truong v. Allstate*, **No. 31,013**

| | |
|---|---|
| **CP** | **CIVIL PROCEDURE** |
| CP-CA | Class Actions |
| | |
| **IN** | **INSURANCE** |
| IN-IG | Insurance, General |
| IN-ID | Insurance Code |
| IN-RI | Regulation or Insurance |
| IN-SE | Settlement |
| | |
| **MS** | **MISCELLANEOUS STATUTES** |
| MS-UP | Unfair Practices Act |
| | |
| **ST** | **STATUTES** |
| ST-AP | Applicability |
| ST-IP | Interpretation |
| ST-LI | Legislative Intent |
| ST-RC | Rules of Construction |
| ST-SG | Statutes, General |