# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2012-NMSC-022

Filing Date: July 2, 2012

Docket No. 32,695

JHETTE DIAMOND,

       Petitioner-Petitioner,

v.

ADRIENNE DIAMOND,

       Respondent-Respondent.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Barbara J. Vigil, District Judge**

Pegasus Legal Services for Children
Peter H. Klages
Tara Ford
Grace Catherine Spulak
Elizabeth V. McGrath
Albuquerque, NM

for Petitioner

Donna J. Lynch
Santa Fe, NM

for Respondent

## OPINION

**SERNA, Justice.**

{1}    This appeal presents this Court with a matter of first impression:  does the  New Mexico Emancipation of Minors Act, NMSA 1978, §§ 32A-21-1 to -7 (1995) (the Act), which provides that a minor may be emancipated for "one or more purposes" set forth in the Act, *see* Section 32A-21-7(D), authorize a district court to declare a minor emancipated for some rather than all of those enumerated purposes?  Based on the plain language and

legislative purpose of the Act, we answer that question in the affirmative and accordingly reverse the Court of Appeals.

## I.    BACKGROUND

**{2}**    Petitioner Jhette Diamond (Daughter), then sixteen years old, petitioned the district court in January 2007 for a declaration of emancipation pursuant to the Act.  Daughter left the home of her mother Adrienne Diamond (Mother) at age thirteen and had been living with several different households since that time.

**{3}**    The district court held a hearing on Daughter's petition in February 2007.  Mother did not appear at the hearing or otherwise oppose the petition.  Daughter, represented by counsel, told the district court that she had moved out of Mother's home due to domestic violence and substance abuse issues.  Daughter had been working since the age of eleven, including for the past several years as a restaurant server and busser, while maintaining a high grade-point average as a sophomore at Española Valley High School.  Counsel described Daughter as "focused on her future," and thriving with the support of the couple with whom she was living.  Daughter had no intention of returning to live with Mother, who maintained a relationship with the man whose violent behavior and substance abuse had contributed to Daughter's decision to leave Mother's home in the first place.

**{4}**    The district court concluded that by all accounts Daughter was capable of making appropriate choices for herself and covering her own expenses, describing Daughter's situation as "a classic case" for emancipation.  Because Mother had not provided any financial support to Daughter before or after Daughter began living apart from Mother, Daughter asked if the emancipation order could be styled to reserve her right to pursue financial support from Mother.  The court agreed provided that counsel could confirm that the Act authorized the court to do so.

**{5}**    The district court issued a "Declaration of Emancipation of Minor" in March 2007, finding that Daughter had been living independently and managing her own financial affairs without support from Mother, determining that emancipation would be in Daughter's best interest, and declaring Daughter "an emancipated minor in all respects, except that she shall retain the right to support from [Mother]" pursuant to Section 32A-21-5(D) of the Act.  Mother filed a pro se motion to set aside the declaration because she had not received adequate notice of the original emancipation hearing.  Mother additionally argued that she had supported Daughter even after Daughter moved out by paying for Daughter's traffic tickets, medical and dental care, and school clothes, and "[was] always giving [Daughter] spending money."  Mother also disputed that Daughter was managing her own financial affairs.

**{6}**    The district court held a hearing on Mother's pro se motion in April 2007. Mother repeated her objections to Daughter's emancipation because, in her view, Daughter was not mature enough to act in her own best interest.  The district court asked Mother for evidence

2

or examples of Daughter's lack of maturity, and Mother could not think of any.

**{7}**     Consistent with her prior representations to the court, Daughter testified that she had been working since age eleven. Daughter added that during the time she was still living with Mother, her earnings went to household expenses such as utility bills, and stated that "whenever my mom asked me for money, I gave it to her." Daughter also reiterated that she had left Mother's home due to violence that Mother's boyfriend perpetrated against both Mother and Daughter, as well as the boyfriend's chronic alcohol and drug abuse.

**{8}**     The incident precipitating Daughter's decision to stop living with Mother, Daughter testified, took place in October 2003. One evening, in the course of an argument, Mother's boyfriend shook Mother and threw her against a bed. Mother began to have a panic attack, and her boyfriend departed. Although she was only thirteen years old at the time, Daughter drove Mother to the hospital. Some time after Mother and Daughter returned from the hospital, Mother's boyfriend reappeared at their home and demanded to see Mother. Daughter told him to leave. Mother's boyfriend pushed his way into the home, and when Daughter continued to block his access to Mother, the boyfriend picked Daughter up and threw her over a couch. Daughter kicked the boyfriend in the face and he again left the home.

**{9}**     After this altercation, Daughter told Mother that she did not want Mother's boyfriend to come over to their home anymore. Instead of asking her boyfriend to stay away, Mother went to live with him at his home, leaving Daughter alone in their trailer with no water, gas, or electricity service due to unpaid bills. Daughter remained in the trailer until being evicted several months later in the middle of winter. During this period, Daughter continued to work and attend school full time. Because there was no food at Mother's home, Daughter frequently obtained food from a woman who employed her at a local restaurant.

**{10}**     Daughter then lived for several months with neighbors, again while attending school full time and remaining employed. She later  moved in with the brother of one of her neighbors, where she lived for several years, continuing to work at a local restaurant, paying for her own expenses and contributing to rent and other household expenses.  Several months before filing her petition for emancipation, Daughter began living with members of the same extended family, a couple who allowed her to stay with them rent-free so that she could focus on school.

**{11}**     Disputing Mother's assertions about having covered certain expenses, Daughter testified that it was actually a concerned teacher who paid for her traffic ticket, that Daughter herself paid for dental care,  and that Medicaid covered the cost of medical care when Daughter broke her arm at school. Daughter acknowledged that on a single occasion Mother had purchased several items of clothing for her,  but that she could not recall Mother ever providing her with spending money, contrary to Mother's claim that she "always" did so. Daughter testified that since living apart from Mother, she would visit Mother at her home approximately once a month but that she could remember only a handful of occasions when

Mother visited her or otherwise attempted to contact her, including once when Mother turned up at Daughter's school to ask her for money.

**{12}** Daughter also explained why she was seeking emancipation. Although at that point in time she had already been living apart from her Mother for two to three years, paying her own expenses, attending school, and working, Daughter testified that she had difficulty obtaining medical insurance, accessing her school report cards, or applying for a driver's permit, all of which required parental consent. Emancipated status also would allow Daughter to open a bank account. Daughter stated that she would be uncomfortable if she were required to resume living with Mother, especially because Mother's abusive boyfriend remained a presence in Mother's home, and because she was doing well on her own.

**{13}** After hearing testimony from Mother and Daughter, the district court ruled from the bench that even assuming that all of Mother's contentions were true, emancipation remained in Daughter's best interest. The district court then re-declared Daughter to be emancipated and issued a formal order to that effect, which included the same provision as the court's prior order that Daughter was "an emancipated minor in all respects, except that she shall retain the right to support from [Mother]" pursuant to Section 32A-21-D(5) of the Act.

**{14}** As permitted by the district court's emancipation orders, in February 2008 Daughter filed a petition asking the district court to order Mother to pay retroactive and prospective child support to Daughter.[1] Although Daughter's support petition was not expressly denominated as such, the parties and the district court treated it as an action to establish parentage and for support under the Uniform Parentage Act, NMSA 1978, §§ 40-11-1 to -23 (1986, as amended through 2004) (repealed and recodified at NMSA 1978, §§ 40-11A-101 to -903 (2009)).

**{15}** A hearing officer determined that Mother had not provided a home or financial support for Daughter since Daughter's emancipation. The hearing officer recommended that Mother be ordered to make support payments to Daughter in the amount of $390.00 per month from March 1, 2008 until Daughter reached the age of eighteen[2] or graduated from

---

[1] Daughter's petition for support payments also sought damages for abandonment, a claim Daughter later withdrew in open court. In addition, Daughter's petition requested establishment of paternity, stating that "[Mother] has always indicated to [Daughter] that she was conceived by artificial insemination, but [Daughter] has no independent information concerning the validity of that claim." At a hearing on Daughter's petition before a Domestic Relations Hearing Officer, Mother testified that she conceived Daughter through artificial insemination, and later agreed to sign a release so that Daughter could obtain confirming records. Daughter ultimately conceded the issue.

[2] Eighteen is the age of majority in New Mexico unless otherwise specifically provided by law. *See* NMSA 1978, § 28-6-1 (1975).

4

high school, whichever event occurred later. The hearing officer reserved for later determination the issue of any child support obligation predating March 1, 2008 (including periods of time both predating and following Daughter's emancipation). The district court affirmed the hearing officer's report over Mother's written objections, and in January 2009 directed that a portion of Mother's retirement benefit, her sole source of income, be garnished and paid to Daughter.

**{16}** The parties filed several subsequent motions before the district court in summer and fall 2009, with Mother now represented by counsel. Mother principally argued that "New Mexico law does not allow child support for an emancipated minor." In these subsequent proceedings, Mother and Daughter repeated much of their prior testimony regarding disputed facts germane to the support issue. In addition, Daughter clarified that her separation from Mother took place in October 2004, rather than October 2003 as she had originally claimed. Daughter also testified that since petitioning for emancipation she had graduated from high school and was now a student at New Mexico State University. Mother, meanwhile, testified that she and Daughter were living together until December 2004 or January 2005. Mother also acknowledged that until March 2009, well past the time of Daughter's emancipation, she maintained an on-again, off-again relationship with the same boyfriend who had behaved violently toward Daughter.

**{17}** The district court reaffirmed its prior ruling that emancipation does not necessarily cut off a minor's right to child support. The court determined that Daughter began living apart from Mother permanently in January 2005, but that Mother's support obligation would begin in March 2005. The court concluded that Daughter was entitled to support from that time through May 2009, when Daughter graduated from high school at age eighteen, in an amount based on statutory guidelines and Mother's income. Accordingly, the court entered judgment in Daughter's favor in the amount of $15,278.00 (with $13,640.00 of that total owed as pre-emancipation support, and $1,638.00 owed as the remaining balance from the period post-dating Daughter's emancipation), and directed Mother to make specified monthly payments to fulfill her support obligation.

**{18}** Mother appealed the judgment entered against her in the support proceeding and a related order from the original emancipation proceeding. The Court of Appeals consolidated the two appeals. *Diamond v. Diamond*, 2011-NMCA-002, ¶ 1, 149 N.M. 133, 245 P.3d 578. Agreeing with Mother, the Court of Appeals held that "New Mexico law does not permit a minor emancipated pursuant to [the Act] to collect child support payments," *id.* ¶ 2, and does not permit "an emancipating court to pick and choose the purposes for which a child is emancipated," *id.* ¶ 21. The Court of Appeals reached this conclusion by determining that "a minor cannot be 'managing his own financial affairs,'" a prerequisite to emancipation under the Act, "if he is subject to his parent's control and is not allowed to retain the wages he has earned. Similarly, a minor cannot be 'managing his own financial affairs' if he is

receiving financial and other support from his parents." *Id.* ¶ 23.[3]

**{19}** Daughter subsequently petitioned this Court for writ of certiorari, presenting three closely interrelated questions, all of which require this Court to resolve whether the Act permits a district court to declare a minor emancipated for certain purposes while reserving that minor's right to seek support from her parent.

## II. THE EMANCIPATION OF MINORS ACT

**{20}** The Legislature first adopted the Act in 1981, NMSA 1978, §§ 28-6-2 to -8 (1981, repealed and recodified at NMSA 1978, §§ 32A-21-1 to -7 (1995)), in response to a concern that "the law of this state is unclear as to the definition and consequences of emancipation of minors [and] that a legislative statement is required." *Id.* § 28-6-3. The Legislature therefore passed the Act to provide such a statement to "defin[e] emancipation and its consequences and to permit an emancipated minor to obtain a court declaration of his status." *Id.*; Section 32A-21-2.

**{21}** The Act defines an emancipated minor as any person sixteen years of age or older who "has entered into a valid marriage, whether or not the marriage was terminated by dissolution," who "is on active duty with any of the armed forces of the United States of America," or who has received a declaration of emancipation" pursuant to the Act. Section 32A-21-3. The Act sets forth three prerequisites to emancipation by judicial declaration. "Any person sixteen years of age or older may be declared an emancipated minor for one or more purposes enumerated in the [Act] if he is [1] willingly living separate and apart from his parents, guardian or custodian, [2] is managing his financial affairs and [3] the court finds it in the minor's best interest." Section 32A-21-4.

**{22}** In addition, the Act provides a procedural mechanism for a minor to obtain a declaration of emancipation. A minor seeking to be emancipated must file a verified petition with the children's court[4] that "set[s] forth with specificity the facts" in support of such

---

[3] The Court of Appeals considered several other issues that are not before this Court. Mother asserted that the district court lacked jurisdiction to enter an order granting Daughter's petition for child support, an argument that the Court of Appeals rejected. *Diamond*, 2011-NMCA-002, ¶ 9. The Court of Appeals held that the district court did not abuse its discretion in ordering Mother to pay pre-emancipation child support to Daughter. *Id.* ¶ 33. The Court of Appeals also determined that the Uniform Parentage Act is an appropriate procedural vehicle for an emancipated minor or adult to seek retroactive support for the period of time pre-dating emancipation. *Id.* ¶ 31.

[4] The children's court is a division of the district court, NMSA 1978, § 32A-1-5(A) (1993), with its own rules of procedure, *id.* § 32A-1-5(B); *see also* Rule 10-101 NMRA (governing children's court procedures).

relief, Section 32A-21-7(A), and the court shall provide notice of the petition to the minor's parent, guardian or custodian, Section 32A-21-7(B). If the court determines the minor to be sixteen years of age or older and to fulfill the preconditions for emancipation, "the court may grant the petition unless, after having considered all of the evidence introduced at the hearing, it finds that granting the petition would be contrary to the best interests of the minor." Section 32A-21-7(C). Upon granting the petition, the court "shall immediately issue a declaration of emancipation containing specific findings of fact and one or more purposes of the emancipation, which shall be filed by the county clerk." Section 32A-21-7(D). Such a declaration "shall be conclusive evidence that the minor is emancipated." Section 32A-21-7(G).

**{23}** As for the legal effect of emancipation, under the Act

[a]n emancipated minor shall be considered as being over the age of majority for one or more of the following purposes:

A. consenting to medical, dental or psychiatric care without parental consent, knowledge or liability;

B. his capacity to enter into a binding contract;

C. his capacity to sue and be sued in his own name;

D. his right to support by his parents;

E. the rights of his parents to his earnings and to control him;

F. establishing his own residence;

G. buying or selling real property;

H. ending vicarious liability of the minor's parents . . . or

I. enrolling in any school or college.

Section 32A-21-5.

## III.    STANDARD OF REVIEW

**{24}** "The setting of child support is within the trial court's discretion and is reviewed on appeal only for an abuse of that discretion." *Styka v. Styka*, 1999-NMCA-002, ¶ 8, 126 N.M. 515, 972 P.2d 16. This appeal, however, does not implicate the district court's discretion in awarding support to Daughter so much as its determination that the Act allows an emancipated minor to pursue child support. "Statutory interpretation is a question of law,

7

which we review de novo." *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69.

**{25}** In interpreting a statute, the Court's "primary goal is to ascertain and give effect to the intent of the legislature." *Jolley v. AEGIS*, 2010-NMSC-029, ¶ 8, 148 N.M. 436, 237 P.3d 738 (internal quotation marks and citation omitted). In assessing intent, "we look first to the plain language of the statute, giving the words their ordinary meaning, unless the Legislature indicates a different one was intended." *Oldham v. Oldham*, 2011-NMSC-007, ¶ 10, 149 N.M. 215, 247 P.3d 736 (internal quotation marks and citation omitted); *see also DeWitt v. Rent-A-Center, Inc.*, 2009-NMSC-032, ¶ 29, 146 N.M. 453, 212 P.3d 341 ("The first and most obvious guide to statutory interpretation is the wording of the statutes themselves."). When interpreting a statute, all sections of the statute "must be read together so that all parts are given effect." *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599. Where the language of a statute is "clear and unambiguous, we must give effect to that language and refrain from further statutory interpretation." *Quynh Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 37, 147 N.M. 583, 227 P.3d 73 (quoting *State v. Jonathan M.*, 109 N.M. 789, 790, 791 P.2d 64, 65 (1990)).

## IV.   DISCUSSION

### A.   Plain Language and Legislative History of the Act

#### 1.   "One or More . . . Purposes"

**{26}** Emancipation confers on eligible minors some or all of "the rights and status of adults." *Ortega v. Salt Lake Wet Wash Laundry*, 156 P.2d 885, 890 (Utah 1945). In setting forth the nine possible legal effects of emancipation, the Act refers to "one or more of the [enumerated] purposes." Section 32A-21-5. Daughter interprets the Act to authorize a district court to "craft an order of emancipation to address only those purposes which meet the best interests of the child seeking emancipation," and asserts that there is nothing absurd about granting a minor many of the legal privileges of adulthood while in appropriate circumstances allowing that minor to pursue parental support. Mother in turn argues that where the Act refers to "one or more . . . purposes" of emancipation, the phrase should be interpreted to mean "all the purposes." According to Mother, allowing a district court to decide the individual purposes for which a minor is emancipated would lead to an "absurd scenario" where the minor could be freed from parental control but prevented from, for instance, establishing his or her own residence. In Mother's view, loss of any entitlement to parental support therefore is a necessary consequence of emancipation, because "[t]here's no such thing as a limited emancipation."

**{27}** The plain meaning of the phrase "one or more . . . purposes" is that a minor may be declared to be emancipated under the Act for a single enumerated purpose, for all nine enumerated purposes, or for any intermediate number of enumerated purposes. "As a rule

8

of construction, the word 'or' should be given its normal disjunctive meaning unless the context of a statute demands otherwise," *Hale v. Basin Motor  Co.*, 110 N.M. 314, 318, 795 P.2d 1006, 1010 (1990), or if "adherence to the literal use of the word leads to absurdity or contradiction," *State v. Block*, 2011-NMCA-101, ¶ 21, 150 N.M. 598, 263 P.3d 940.  Our courts have employed this common-sense principle in a variety of statutory contexts.  *See generally State v. Dunsmore*, 119 N.M. 431, 433, 891 P.2d 572, 574 (Ct. App. 1995) ("The use of the disjunctive 'or' indicates that the statute may be violated by any of the enumerated methods."); *State v. Tsosie*, 2011-NMCA-115, ¶ 27, 150 N.M. 754, 266 P.3d 34 (Where a statute offers a list of various alternative definitions for a particular term, "[t]he Legislature's use of the word 'or' indicates that any of the listed definitions" could apply.); *Schneider Nat'l, Inc. v. State Taxation & Revenue Dep't*, 2006-NMCA-128, ¶¶ 9-10 , 140 N.M. 561, 144 P.3d 120 (The word "or," in a statute providing that a limitations period begins after "mailing or delivery," "indicate[s] that mailing and delivery are alternative acts."); *see also State v. Downey*, 2008-NMSC-061, ¶ 26, 145 N.M. 232, 195 P.3d 1244 ("The use of the disjunctive 'or' in Rule 11-702 permits a witness to be qualified under a wide variety of bases . . .").

**{28}** The Act's reference to "one or more of the following purposes" for which emancipation may be granted cannot be viewed as haphazard or isolated.  The Act employs this key phrase not only in enumerating the nine possible grounds for emancipation, Section 32A-21-5, but also in investing the district court with the authority to declare a minor to be emancipated, Section 32A-21-4 ("Any person sixteen years of age or older may be declared an emancipated minor for one or more of the purposes enumerated in the [Act]" if specified prerequisites are met.).  The Act also directs a district court granting a minor's petition to "immediately issue a declaration of emancipation containing specific findings of fact and one or more purposes of the emancipation."  Section 32A-21-7(D).  This last reference to "one or more purposes" is especially significant, because there is no logical reason for requiring courts to identify the specific purposes for which emancipation is being granted if every emancipation automatically fulfills *all* of the enumerated purposes.

**{29}** "We must assume the legislature chose its words advisedly to express its meaning unless the contrary intent clearly appears."  *State v. Maestas*, 2007-NMSC-001, ¶ 22, 140 N.M. 836, 149 P.3d 933 (quoting *Varoz v. N.M. Bd. of Podiatry*, 104 N.M. 454, 456, 722 P.2d 1176, 1178 (1986) (internal quotation marks and brackets omitted)).  Not only does the Act fail to evidence any legislative intent contrary to the plain meaning of "one or more purposes," the history of its enactment provides persuasive indications of the Legislature's intent that district courts should tailor emancipation orders to the best interests of the minor in each particular case.

**{30}** As originally introduced, the legislation that ultimately became the Act included language consistent with Respondent's (and the Court of Appeals') interpretation, namely that "[a]n emancipated minor shall be considered as being over the age of majority *for the purpose of*" the nine specific grounds.  H.B. 271, § 5, 35th Legislature, 1st session (N.M. 1981) (emphasis added).  The Legislature considered and rejected this phrasing, opting

instead for the more flexible alternative of "one or more of the following purposes." House Judiciary Committee Substitute for H.B. 271, § 5, 35th Legislature, 1st session (N.M. 1981); § 28-6-6 (1981, repealed and recodified at NMSA 1978, §§ 32A-21-1 to -7 (1995)).

{31}    Other revisions to the bill prior to enactment further illustrate the Legislature's preference that district courts retain the discretion to emancipate a minor in a manner consistent with that minor's individual circumstances and needs. Besides incorporating the "one or more" language, the Legislature added a requirement that the district court must, before granting a declaration of emancipation, determine that doing so would be in the minor's best interest, § 28-6-5; made a court's grant of a qualifying emancipation petition discretionary rather than mandatory, § 28-6-8(C); and added a requirement that the emancipation declaration set forth findings of fact and the specific purposes for which emancipation is granted, § 28-6-8(D). The history of the Act's passage thus provides further confirmation that the plain meaning of "one or more purposes" is consistent with the Legislature's intent. Contrary to the Court of Appeals' determination that the Act does not authorize partial emancipation, *Diamond*, 2011-NMCA-002, ¶ 24, we hold that the Act's directive that emancipation may be declared for "one or more purposes" expressly authorizes partial emancipation.

### 2.    "Managing [One's] Own Financial Affairs"

{32}    The Act requires that a minor must be living independently and "managing his own financial affairs" in order to be emancipated. Section 32A-21-4. Mother argues that "in the context of [the Act], 'managing his financial affairs' is synonymous with being financially independent, self-supporting, self-sufficient . . ., it is axiomatic that to be emancipated you must be self-supporting and if you are self-supporting you are not in need of or entitled to support." Daughter responds that managing one's financial affairs is not the equivalent of total financial self-sufficiency. We agree with Daughter.

{33}    The Act does not define the phrase "managing [one's] financial affairs," but that term logically would include obtaining income and transacting for the necessities of life. Our caselaw usually employs the term in guardianship and conservatorship proceedings, where, for example, a court must find an adult "incapacitated and unable to manage an estate and financial affairs" in order to appoint a conservator for that person. *In re Conservatorship of Chisholm*, 1999-NMCA-025, ¶ 12, 126 N.M. 584, 973 P.2d 261. Here, the district court determined that Daughter had been living independently and that Daughter had paid for all of her expenses out of her own earnings since March 2005, with no support from Mother. Daughter sought emancipation, in part, to obtain health insurance and open a bank account, further evidence of her intent and capacity to manage her own affairs but for certain legal impediments of minority.

{34}    The Court of Appeals agreed with Mother and found the district court's interpretation of the Act "paradoxical," explaining that "a minor cannot be 'managing his own financial affairs' if he is receiving financial and other support from his parents." *Diamond*, 2011-

10

NMCA-002, ¶ 23. We do not see management of one's financial affairs and entitlement to support as inherently contradictory. Certainly, in other proceedings courts routinely award support without any finding or implication that the recipient is incapable of managing his or her affairs. *See generally Mitchell v. Mitchell*, 104 N.M. 205, 214, 719 P.2d 432, 441 (Ct. App. 1986) (awarding spousal support based on circumstances of supporting spouse and recipient spouse).

{35} The Act itself contemplates that an emancipated minor may receive public assistance: An emancipated minor "shall not be denied benefits from any public entitlement program which he may have been entitled in his own right prior to the declaration of emancipation." Section 32A-21-6. A minor entitled to public assistance is necessarily not entirely self-supporting, at least not after he or she begins to receive the assistance payments. Under the Court of Appeals' interpretation of the Act, Daughter would be managing her own financial affairs if she were receiving financial support from the State, but not if she were receiving support from Mother. Mother does not offer any explanation for why the *source* of the support should be determinative of Daughter's ability to manage her affairs, and indeed such an approach would be inconsistent with our "strong public policy" favoring parental support where appropriate. *In re Estate of DeLara*, 2002-NMCA-004, ¶ 10, 131 N.M. 430, 38 P.3d 198. Finally, in the present case, the district court expressly did *not* emancipate Daughter with respect to her entitlement to support, so for that sole purpose she retained the status of minority. That determination explains why the district court set Daughter's eighteenth birthday or high school graduation, whichever occurred later, as the date terminating Mother's support obligation. Up until that moment, for support purposes only, Daughter remained a minor.

## B. Partial and Complete Emancipation in Other States

{36} Although we find ample support for our interpretation of the Act in its plain language and legislative intent, a brief review of several other states' emancipation statutes, illustrative rather than exhaustive, indicates a diversity in approach to defining the legal effects of emancipation. Some states have determined that emancipation should always entail a fixed rather than a flexible set of legal consequences. For example, in contrast to the Act's provision that emancipation may be ordered for "one or more purposes," California's emancipation statute directs that an emancipated minor "shall be considered as being an adult for the following purposes," Cal. Fam. Code Ann. § 7050 (West 1992, operative Jan. 1, 1994), that is, for *all* of the seventeen purposes enumerated by the California statute, including "the minor's right to support by the minor's parents," *id.* § 7050(a), the parent's rights to "the minor's earnings and to control the minor," *id.* § 7050(b), and the minor's capacity to "establish [his or her] own residence," *id.* § 7050(e)(15). California courts have recognized the California legislature's deliberate choice to create a form of statutory emancipation with the same set of legal consequences for each affected minor. *See W. Shield Investigations & Sec. Consultants v. Superior Court*, 98 Cal. Rptr. 2d 612, 621 (Ct. App. 2000) ("[I]f the trial court could pick and cho[o]se among the list of legal consequences of emancipation set forth in [the California statute], the result would be partial emancipation,

with different emancipated minors holding different adult powers.  This undesirable result is exactly what the Legislature sought to eliminate when it enacted the Emancipation Act.").

**{37}**    Consistent with California's approach and in contrast to ours, Vermont law provides that an emancipation order "shall recognize the minor as an adult for *all purposes* that result from reaching the age of majority, including . . . terminating parental support and control of the minor and [parental] rights to the minor's income."  Vt. Stat. Ann. tit. 12, § 7156(a) (West 1995) (emphasis added), § 7156(a)(6).  Pennsylvania state law does not set forth a specific statutory mechanism for a minor to obtain a declaration of emancipation, but nonetheless expressly provides that " [a] court shall not order either or both parents to pay for the support of a child if the child is emancipated."  23 Pa. Cons. Stat. Ann. § 4323(a) (West 1985).

**{38}**    Other states, while perhaps not favoring parental support for emancipated minors, do not foreclose it either.  Under Nevada law, for example, an emancipation decree confers the right of majority for six enumerated purposes, including entering into contracts or incurring debts, Nev. Rev. Stat. § 129.130(3)(a) (1987, as amended through 2003), obtaining medical care without parental consent, *id.* § 129.130(3)(d), and establishing the minor's own residence, *id.* § 129.130(3)(f), but not elimination of support from a parent.  Whether to award support, however, is left to the discretion of the court considering the emancipation petition, with the default under the statute for support to cease upon emancipation: "Unless otherwise provided by the [emancipation] decree, the obligation of support otherwise owed a minor by his or her parent or guardian is terminated by the entry of the decree."  *Id.*

**{39}**    On the other hand, New Mexico is far from the only state where a minor's emancipation does not presumptively extinguish a parent's support obligation.  Montana's emancipation statute probably resembles New Mexico's most closely.  If a Montana court grants a petition for emancipation, it must issue an order that "specifically set[s] forth the rights and responsibilities that are being conferred upon the youth[, which] may include but are not limited to one or more" of a list of six purposes.  Mont. Code Ann. § 41-1-503 (2) (2009).  Those purposes include the right to live in housing of the minor's choice, *id.* § 41-1-503(2)(b), the right to enter into contracts and incur debts, *id.* § 41-1-503(2)(d), the right to consent to medical care, *id.* § 41-1-503(2)(e), and the right to "directly receive and expend money to which the youth is entitled and to conduct the youth's own financial affairs," *id.* § 41-1-503(2)(c).  The Montana statute, like ours, does not define emancipation to automatically end a parent's support obligation.

**{40}**    At least one state goes further than New Mexico by not merely permitting but *mandating* parental support for emancipated minors.  Under Michigan's emancipation statute, a court may declare a minor emancipated "for the purposes of, but not limited to, all of the following [fourteen purposes]," Mich. Comp. Laws Ann. § 722.4e(1) (West 1968, as amended through 1988, effective Mar. 30, 1989), a list that does not include child support.  Instead, Michigan law explicitly provides that "[t]he parents of a minor emancipated by court order are jointly and severally obligated to support the minor," except that the parents

12

are not liable for debt incurred by the minor during the period of emancipation, *id.* § 722.4e(2).

**{41}** The point of the foregoing review is to illustrate the wide variety of approaches states employ to determine what legal consequences emancipation should have, particularly with respect to the provision of child support. Our Legislature could easily have decided that emancipation *ipso facto* extinguishes a parent's support obligation to a child, an alternative that it initially considered and that some other states have adopted. Instead, the Legislature ultimately chose to confer authority on the district courts to determine in each particular case whether an emancipated minor is entitled to support.

## C.    Emancipation at Common Law

**{42}** While our holding that the Act allows a district court to reserve a minor's right to financial support from a parent follows from the plain language of the Act, it is consistent with the treatment of emancipation under the common law. Historically, American courts recognized a "correlative" relationship between a parent's duty to support his or her minor child and the parent's entitlement to the child's services and earnings. 1 Homer H. Clark, Jr., *The Law of Domestic Relations in the United States* § 9.3, at 548-49 (2d ed. 1987). Under this approach,

> the father [was] entitled to the services and earnings of his minor children, because he [was] bound to support and educate them. The right grows out of the obligation, and is correlative to it. When one ceases the other ceases also. The helplessness of the infant, demanding the tutelage and support of the father, in contemplation of law terminates in ordinary cases at twenty-one [then the age of majority], and the child becomes emancipated from parental control and entitled to his own earnings.

*Campbell v. Cooper*, 34 N.H. 49, at *10 (1856); *see also Nightingale v. Withington*, 15 Mass. 272, 274 (1818) (instructing that the "obligation of the parents to nurture and support their children . . . is compensated by a right to their services, or to the fruits of them"); *Memphis Steel Constr. Co. v. Lister*, 197 S.W. 902, 904 (Tenn. 1917) ("The duties and obligations of parent and child are, in some measure, reciprocal. The natural and legal duty of the parent is to support the child; and by way of return the father has a right to the services of the child during minority."). More contemporary cases instead view the minor's reciprocal duty as submitting to the parent's control. *See, e.g.*, *Howard Frank, M.D., P.C. v. Superior Court of Ariz.*, 722 P.2d 955, 958 (Ariz. 1986) (noting that "emancipation frees parents and children from the reciprocal legal obligations of support and obedience").

**{43}** Emancipation developed largely to protect minors from claims against their wages asserted by their parents or by third parties. *See, e.g.*, *Am. Prods. Co. v. Villwock,* 109 P.2d 570, 580 (Wash. 1941) (noting that emancipation may be invoked "to protect the minor's earnings against the unfortunate parent's creditors." (quoting 1 James Schouler & Arthur

W. Blakemore, *A Treatise on the Law of Marriage, Divorce, Separation and Domestic Relations*, § 807, at 897 (6th ed. 1921)); *Lackman v. Wood*, 25 Cal. 147, 151 (1864) (Emancipation frees a minor "from parental control; he can claim his earnings thereafter as against his father."). A minor could only be emancipated through parental consent, although that consent could be implied as well as express. *Inhabitants of Lowell v. Inhabitants of Newport*, 66 Me. 78, 89 (1876). A parent's abandonment of a minor, or even oral expressions of an intent to abandon the minor, could constitute an implied consent to emancipation. *Kidd v. Joint Sch. Dist. No. 2, City of Richland Ctr. and Town of Richland*, 216 N.W. 499, 500 (Wis. 1927); *see also Nightingale*, 15 Mass. at 274 ("But where the father has discharged himself of the obligation to support the child, or has obliged the child to support himself, there is no principle, but that of slavery, which will continue his right to receive the earnings of the child's labor. Thus, if the father should refuse to support a son . . . the law will imply an emancipation of the son. . . .").

**{44}**    Courts have long recognized that common-law emancipation may be partial, that is, conferring some but not all of the aspects of adult status on the minor. *See Lufkin v. Harvey*, 154 N.W. 1097, 1098 (Minn. 1915) ("A minor may be emancipated for some purposes and not for others."); *P.J. Hunycutt & Co. v. Thompson*, 74 S.E. 628, 629 (N.C. 1912) ("There may be a total emancipation or a partial emancipation."); *Swartz*, 8 Cal. at 123; *see also* Black's Law Dictionary 468 (5th ed. 1979) ("[A] 'partial emancipation' frees a child for only a part of the period of minority, or from only a part of the parent's rights, or for some purposes, and not for others."). While courts typically treated complete emancipation as "terminating the parent's legal duty to support the child," *Villwock*, 109 P.2d at 579, partial emancipation would not necessarily do so. *See In re Sonnenberg*, 99 N.W.2d 444, 448 (Minn. 1959) ("[A]n emancipation may be limited to a termination of parental rights and control without relieving the parent from his legal obligation of furnishing the child with necessary support if needed and if not otherwise provided."); *see also P.J. Hunycutt & Co.*, 74 S.E. at 629 (noting that if the father "ran [his son] off from home, then there could be no emancipation which would relieve the father from the duty of providing necessities for the son.").

**{45}**    Prior to passage of the Act, New Mexico courts recognized emancipation under the common law. *See generally Mason v. Mason*, 84 N.M. 720, 723, 507 P.2d 781, 784 (1973) ("[M]arriage and other conditions may earlier emancipate a child from his or her status of minority."). In contrast to the procedures provided by the Act for seeking emancipation, under our common law, as in other states, "[t]he power to emancipate a minor reside[d] in that parent or those parents having the duty to support the child." *Fevig v. Fevig*, 90 N.M. 51, 52, 559 P.2d 839, 840 (1977). As in other states, common-law emancipation in New Mexico could be express, where "the parent freely and voluntarily agrees" to allow a minor child to live independently and control his or her own earnings, *id.*, or implied, where "the child is no longer subject to parental care and discipline," *id.* at 53, 559 P.2d at 841.

**{46}**    In *Fevig*, after their parents' divorce, two minor girls lived first with their mother and then with their father. Following a period of conflict with their father and his new wife, the

14

girls then moved to the home of their older sister, who sought support payments from both parents on the girls' behalf. *Id.* The district court concluded that the girls became emancipated by voluntarily leaving their parents' homes, and therefore neither parent had a duty to support the minors. *Id.* This Court reversed, holding that while "there was a partial emancipation of [the girls] with respect to their parents' right to discipline and care for them. However, the parents' duty of support has not been extinguished." *Id.* This holding, consistent with the common law as it developed in other states, recognized that emancipation requires a fact-specific inquiry and that the appropriateness of support will depend on the circumstances of the individual minor and his or her family. *Id. See also* 1 Clark, *supra*, § 9.3, at 553 ("Since the issue of the right to support arises in many ways, there are situations in which a child who would be considered 'emancipated' for other purposes would not be entitled to support and others in which he would be so entitled."); *cf. State v. Langford*, 176 P. 197, 200 (Or. 1918) ("If the child is able to earn [his or her] own support, in whole or in part, the father is not obliged to support his offspring in idleness; but he is bound to furnish such portion as the child cannot, all things being considered, earn by reasonable effort.").

## D.    Public Policy Considerations

**{47}**    The Legislature's decision to allow district courts to determine the extent of an emancipated minor's rights and responsibilities also comports with our state's public policy. "In New Mexico, there is a strong tradition of protecting a child's best interests in a variety of circumstances." *Sanders v. Rosenberg*, 122 N.M. 692, 694, 930 P.2d 1144, 1146 (1996) (internal quotation marks and citation omitted); *see also Bustamento v. Analla*, 1 N.M. 255, 255 (N.M. Terr. 1857) (noting, in ruling on a custody dispute, that "[i]t is to the benefit and welfare of the infant to which the attention of the court ought principally to be directed"). Furthermore, "[i]t is well-settled law that when [a] case involves children, the trial court has broad authority to fashion its rulings in [the] best interests of the children." *Sanders*, 122 N.M. at 694, 930 P.2d at 1146 (internal quotation marks and citations omitted). In legal matters concerning minors, "the rule of 'best interests of the children' is essentially equitable." *State ex rel. Children, Youth &Families Dep't v. A.H.*, 1997-NMCA-118, ¶ 8, 124 N.M. 244, 947 P.2d 1064; *see also In re Adoption of Francisco A.*, 116 N.M. 708, 713, 866 P.2d 1175, 1180 (Ct. App. 1993) ("[W]hen dealing with children, the district court is exercising its equitable powers. The touchstone of equity is that it is flexible; the court of equity has the power of devising its remedy and shaping it so as to fit the changing circumstances of every case and the complex relations of all the parties."(internal quotation marks and citations omitted)).

**{48}**    More specifically, the district courts are properly "invested with broad discretion and flexibility in determining an award of child support." *DeTevis v. Aragon*, 104 N.M. 793, 800, 727 P.2d 558, 565 (Ct. App. 1986) (citing *Henderson v. Lekvold*, 95 N.M. 288, 621 P.2d 505 (1980); *Spingola v. Spingola*, 91 N.M. 737, 580 P.2d 958 (1978)); *see also Fosmire v. Nicoleau*, 144 A.D.2d 8, 16 (N.Y. App. Div. 1989) (In matters involving the protection of minor children, "the court must be allowed wide latitude and broad flexibility . . . because of the endless variety of human situations which can be presented in cases of this nature.

There are no preordained answers and the result in any case will be totally dependent upon the unique facts involved therein.").

{49}  Giving effect to the plain meaning of the Act is consistent with our state's public policy favoring judicial determination of the best interests of the minor. A district court could, for example, where appropriate declare a minor emancipated for a single purpose, such as "consenting to medical, dental or psychiatric care without parental consent, knowledge or liability," Section 32A-21-5(A), or attending college, Section 32A-21-5(I). Similarly, a district court has the discretion to declare a minor emancipated for a greater number of purposes, or all of the purposes, set forth in the Act. The critical inquiry remains the best interests of the minor, Section 32A-21-4 and Section 32A-21-7(C), which the court determines on the basis of specific findings of fact, Section 32A-21-7(D). The mere possibility that a district court might abuse its discretion in declaring a minor emancipated for particular purposes does not provide a sufficient basis for reading words out of the Act.

## V.  CONCLUSION

{50}  The Act provides that emancipation may be declared for "one or more purposes," including the minor's right to support by his or her parents. The district court based its decision to order post-emancipation support on a great deal of evidence regarding Daughter's and Mother's relationship, life choices, and financial circumstances. In rendering its judgment, the district court faithfully followed the procedural requirements of the Act and reached a result consistent with the Act's plain language. Because the Court of Appeals failed to give effect to that language, we reverse.

{51}  **IT IS SO ORDERED.**

_____
**PATRICIO M. SERNA, Justice**

**WE CONCUR:**


_____
**PETRA JIMENEZ MAES, Chief Justice**


_____
**RICHARD C. BOSSON, Justice**


_____
**EDWARD L. CHÁVEZ, Justice**


_____
**CHARLES W. DANIELS, Justice**

16

**Topic Index for *Diamond v. Diamond*, Docket No. 32,695**

**APPEAL AND ERROR**
Standard of Review

**CHILDREN**
Emancipation
Uniform Parentage Act

**DOMESTIC RELATIONS**
Child Support

**STATUTES**
Interpretation