The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number:

Filing Date: May 8, 2025

**NO. S-1-SC-40126**

**MANUEL LERMA,**

Plaintiff-Respondent,

v.

**STATE OF NEW MEXICO and**
**NEW MEXICO DEPARTMENT**
**OF CORRECTIONS,**

Defendants-Petitioners.

**ORIGINAL PROCEEDING ON CERTIORARI**
**James Lawrence Sanchez, District Judge**

Stiff, Garcia & Associates, LLC
John S. Stiff
Julia Y. Parsons
Albuquerque, NM

for Petitioners

Valdez and White Law Firm, LLC
Timothy L. White
Albuquerque, NM

for Respondent

New Mexico Association of Counties
Grace Philips
Mark L. Allen
Santa Fe, NM

for Amicus Curiae New Mexico Association of Counties

University of New Mexico, Office of General Counsel
Loretta Martinez, General Counsel
Albuquerque, NM

for Amicus Curiae University of New Mexico

**OPINION**

**THOMSON, Chief Justice.**

{1}    This opinion establishes the proper standard for evaluating when *a public employee's disclosure of illegality or other wrongdoing on the part of a public employer* is protected from reprisal under New Mexico's Whistleblower Protection Act (NMWPA), NMSA 1978, §§ 10-16C-1 to -6 (2010). More specifically, we settle the question whether the disclosure is required to pertain to a matter of public benefit in order to qualify for protection under the NMWPA.

{2}    As the record below reveals, this question was not presented by the parties, but by the Court of Appeals on its own initiative. Answering it in the negative, the Court of Appeals created a conflict in its own precedential decisions, resulting in a stalemate over the public benefit issue within our sparse public whistleblower case law. The Court of Appeals' opinion here and an earlier opinion by that Court are conflicting and irreconcilable in terms of the public benefit issue. *Compare Lerma v. State*, 2024-NMCA-011, ¶ 23, 541 P.3d 151 (rejecting "the public benefit limitation adopted by *Wills*"), *with Wills v. Bd. of Regents of Univ. of N.M.*, 2015-NMCA-105, ¶ 20, 357 P.3d 453 (protecting only "'whistleblowing' that benefits the public").

{3} We conclude that the *Lerma* Court's unrequested departure from *Wills* created a jurisprudential disruption to a critical aspect of the NMWPA. On the merits, we correct the statutory analysis in *Lerma* as an all-too-narrow reading of the text of the NMWPA, a reading unaccompanied by any alternative methods of statutory construction. *See Truong v. Allstate Ins. Co.*, 2010-NMSC-009, ¶ 37, 147 N.M. 583, 227 P.3d 73 (explaining that further interpretation is precluded only when "a statute contains language which is clear and unambiguous" (internal quotation marks and citation omitted)); *Bishop v. Evangelical Good Samaritan Soc'y*, 2009-NMSC-036, ¶ 11, 146 N.M. 473, 212 P.3d 361 (explaining that "we go beyond the mere text of the statute" "when the literal meaning . . . would be absurd, unreasonable, or otherwise inappropriate"). Further, we reaffirm what the *Wills* Court held: only communications "that benefit[] the public . . . [are] protected" under the NMWPA. 2015-NMCA-105, ¶ 20. Consequently, we reverse and remand.

## I. BACKGROUND

### A. Factual Background

{4} Plaintiff Manuel Lerma, a corrections officer with sixteen years of experience working for Defendant New Mexico Department of Corrections (DOC), voluntarily transferred from one New Mexico prison facility to another and was assigned to transportation duties at the new location. Plaintiff's duties included guarding the

2

prison's sally port. The sally port comprised two adjoining gates, and Plaintiff described the "standard procedure" for operating a dual-gate system—"to have one gate closed . . . when you open [the other] gate"—as a "safety protocol."

{5} Plaintiff's "strict" enforcement of the sally port protocol quickly caused disagreement between Plaintiff and several other transportation division corrections officers, who wanted Plaintiff to leave both gates open "at the same time . . . so they could come and go as they pleased." Plaintiff alleges that one day while he was driving home from the prison, his vehicle "kept [being] block[ed]" when it was sandwiched between two vehicles, each driven by a DOC employee, causing him to pull his vehicle over and stop in an empty lot. Plaintiff, "fearing for [his] life," was beaten by a fellow corrections officer. A prison supervisory lieutenant filmed the altercation using his agency-issued cell phone.

{6} Plaintiff timely reported the two work-related issues. Plaintiff reported the persistent pushback he faced from his coworkers on the sally port issue to the supervisory transport lieutenant who, perhaps coincidentally, was later involved in the violent roadside encounter. He reported the roadside beating to the director of the prison facility's security threat investigative unit and two deputy wardens. Both the transport lieutenant and the corrections officer who together initiated the violent

3

roadside episode were cited and disciplined for misconduct as a result of what the DOC acknowledged constituted "egregious conduct."

**B.     Procedural Background**

{7}     Plaintiff filed a claim under the NMWPA in response to the events described above. In the district court, both parties accepted as a given the efficacy of the public benefit requirement in evaluating public employee whistleblower claims recognized by *Wills*, 2015-NMCA-105, ¶ 20. The parties centered their attention on the merits of their respective showings relating to the public benefit inquiry, not on whether such proof is required. Defendants DOC and the State argued that Plaintiff's reporting did not qualify as whistleblowing activity since his reporting would not, if disclosed, serve the public benefit as required by *Wills*. Plaintiff, on the other hand, pointed out that he reported both the battery and his coworkers' failure to follow safety protocol regarding sally ports, disclosures that are in the public benefit.

{8}     The district court granted Defendants' motion for summary judgment and dismissed the complaint in a three-sentence order that was devoid of analysis, citation of authority, and material facts upon which the conclusion was based.

{9}     The parties adhered to the same fact-specific approach in addressing the public benefit issue before the Court of Appeals. Plaintiff reiterated that his disclosure of the sally port controversy served to further DOC's policies in

4

preventing prisoner escapes while Defendants again cited *Wills* in reprising their contention that Plaintiff's disclosures "primarily benefited" him personally, not the public.

{10}     Despite the fact-intensive, *Wills*-based presentations submitted by the parties in the district court, the Court of Appeals panel abandoned the public benefit principles expressly adopted in that case. *See Lerma*, 2024-NMCA-011, ¶¶ 15-25 (addressing and "reject[ing]" on its own initiative the public benefit requirement announced in *Wills* without characterizing its analysis as *sua sponte*, explaining the source of the Court's authority to do so, or affording any deference to the *Wills* Court's earlier statutory analysis).

{11}     This Court granted Defendants' petition for certiorari, agreeing to consider two distinct but related issues: (1) whether a public employee's communication that involves "a matter of private interest" rather than one relating to "a matter of public concern" is protected under the NMWPA and, assuming the first question is answered in the negative, (2) whether the communications here involve a matter of public benefit and are thus protected from retaliation under the statute. We quash the second, fact-based issue—one that remains unanswered despite being the subject of the parties' exclusive attention in the Court of Appeals—as improvidently granted.

5

We decide only the statutory analysis issue and leave it to the Court of Appeals to determine on remand the outcome of Defendants' summary judgment motion.

## II. DISCUSSION

{12} The opinion of the Court of Appeals in this case has resulted in two different panels of our Court of Appeals in two separate cases reaching diametrically opposed conclusions on the question whether a disclosure must pertain to a matter of public benefit for a whistleblowing action to be brought under the NMWPA. While this stalemate persists, our whistleblower jurisprudence provides no clear legal guidance on this important aspect of whistleblowing disputes.

{13} Before addressing the merits of the appeal, we consider the problems created by the proactive approach taken by the Court of Appeals in deciding this case.

### A. The Problems Created by the Court of Appeals' Opinion

{14} Both the Court of Appeals' *sua sponte* treatment of the unraised issue, whether a public benefit limitation is properly read into the NMWPA, and the lack of deference shown by the *Lerma* Court to the *Wills* Court's prior interpretation of the statute were improper.

{15} The unanimous Court of Appeals panel in *Wills*, 2015-NMCA-105, ¶ 20, held that the NMWPA protects a whistleblower from retaliation for a disclosure "that benefits the public by exposing unlawful and improper actions by government

6

employees," while the unanimous panel in *Lerma*, 2024-NMCA-011, ¶¶ 23-24, reached the contrary conclusion that the statute does not "require[] a plaintiff to prove that [a] communication benefited the public" in expressly "reject[ing] the public benefit limitation adopted by *Wills*."

{16} The Court's unorthodox approach—declining to decide the narrow, case-specific issues the parties presented—served to minimize, if not ignore, the limited but critical role an intermediate appellate court plays in error-correction. *See* Daniel John Meador, *Appellate Courts in the United States* 12, 18 (2d ed. 2006) (Thomson/West) (observing that the "primary mission" of an intermediate appellate court is "to apply the existing law of the jurisdiction as best it can interpret it, not to make new law" or otherwise assume "responsib[ility] for the definitive enunciation of the state's law"). At the same time our Court of Appeals encroached upon this Court's distinct and essential function of deciding new law. *See* Victor Eugene Flango, *State Supreme Court Opinions as Law Development*, 11 J. of App. Prac. & Process 105, 105-06 (2010) (noting that state supreme courts, as courts of last resort, are "primarily concerned with the development and declaration of law" and, indeed, that the "primary rationale for the creation of intermediate appellate courts [was] to dispose of the bulk of appeals so that supreme courts [could] focus on cases with significant policy implications or cases of high salience to the public"); *see also* John

7

W. Poulus, *The Judicial Process and Substantive Criminal Law: The Legacy of Roger Traynor*, 29 Loyola of L.A. L. Rev. 429, 456-57 (1996) (recognizing the import of a state supreme court's "law-maintaining" function in "promot[ing] the uniformity of law within the state by overruling discordant authority in the lower appellate courts . . . [and in] clarif[ying] existing law").

{17}    The lack of deference shown by the Court of Appeals panel to its fellow panel's prior precedential opinion in *Wills* runs counter to even the most liberal interpretation of the law-of-the-circuit doctrine, under which "considerable weight" must be given by later panels to prior panel decisions of the same court, and it is "rarely appropriate" to part ways with a prior precedent "just to move from one side of a conflict to another." *United States v. Reyes-Hernandez*, 624 F.3d 405, 412 (7th Cir. 2010) (internal quotation marks and citations omitted). Although the "law-of-the-circuit doctrine" was initially a creature of federal law, it has been adopted and applied in one form or another by state courts as well. *See* 21 C.J.S. *Courts* § 200 & nn. 1-11 (2016) (internal quotation marks omitted) (collecting federal and state cases).

{18}    New Mexico courts have not yet directly addressed the doctrine, and, in the absence of briefing on the issue by the parties, we decline to address it. However, familiar principles of stare decisis dictate that a subsequent panel facing an identical

8

issue of statutory interpretation must give *some* degree of deference to the holding of a prior panel of the same court. *See Padilla v. State Farm Mut. Auto. Ins. Co.*, 2003-NMSC-011, ¶ 7, 133 N.M. 661, 68 P.3d 901 (explaining that stare decisis "dictates adherence to precedent" and "require[s] a compelling reason to overrule [a] prior case[]"); *see also Shepard v. United States*, 544 U.S. 13, 23 (2005) ("[T]he claim to adhere to case law is generally powerful once a decision has settled statutory meaning."). Private litigants and governmental institutions were operating under *Wills*, a case dating back to 2015. Such an opinion left undisturbed creates reliance in its application and a sudden departure needs to be thoughtfully considered.

{19}     We need not definitively address the consequences of the errors we ascribe to the Court of Appeals because we conclude, as explained below, that there was a substantive error—the Court of Appeals' statutory analysis of the NMWPA—that independently requires reversal. It is sufficient to say that the interests of judicial economy and clarity, as well as the integrity of this state's whistleblower jurisprudence, would have been best served had the Court of Appeals approached the matter differently in three ways: (1) by fulfilling its error-correction responsibilities by resolving the appeal as it was presented by the parties—under the long-prevailing public benefit standard articulated in *Wills*; (2) by noting and explaining its disagreement with that standard; and (3) by encouraging this Court to

9

take up the issue on certiorari review. The approach followed by the Court of Appeals left the bench and bar of this state without any meaningful guidance on the all-important public benefit issue for too long and with little corresponding benefit. We turn now to the merits of this appeal.

**B.  The Statutory Analysis by the Court of Appeals Was Substantively Flawed**

**1.  Standard of review**

{20}  Appellate review of orders that grant or deny summary judgment is de novo. *Cahn v. Berryman*, 2018-NMSC-002, ¶ 12, 408 P.3d 1012. "Summary judgment is appropriate in the absence of any genuine issues of material fact and where the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citation omitted). In circumstances where, as here, our summary judgment analysis entails statutory interpretation, de novo review again applies. *Jones v. City of Albuquerque Police Dep't*, 2020-NMSC-013, ¶ 17, 470 P.3d 252.

{21}  "In interpreting statutes, we seek to give effect to the Legislature's intent, and in determining intent we look to the language used and consider the statute's history and background." *Key v. Chrysler Motors Corp.*, 1996-NMSC-038, ¶ 13, 121 N.M. 764, 918 P.2d 350. Under the plain meaning rule, "when a statute contains language which is clear and unambiguous, we must give effect to that language and refrain

from further statutory interpretation." *Truong*, 2010-NMSC-009, ¶ 37 (brackets, internal quotation marks, and citation omitted).

{22} However, "[w]e must also consider the practical implications and the legislative purpose of a statute, and when the literal meaning of a statute would be absurd, unreasonable, or otherwise inappropriate in application, we go beyond the mere text of the statute." *Bishop*, 2009-NMSC-036, ¶ 11. "Although appellate courts will not read into a statute language which is not there, we do read the act in its entirety and construe each part in connection with every other part in order to produce a harmonious whole." *Britton v. Off. of Att'y Gen.*, 2019-NMCA-002, ¶ 28, 433 P.3d 320 (brackets, internal quotation marks, and citation omitted). "For the purpose of determining the legislative intent we may look to the title, and ordinarily it may be considered as a part of the act if necessary to its construction." *Tri-State*

*Generation & Transmission Ass'n, Inc. v. D'Antonio*, 2012-NMSC-039, ¶ 18, 289 P.3d 1232 (internal quotation marks and citation omitted).[1]

**2.     Text and purpose of the NMWPA**

{23}     The NMWPA's "short title" is the "Whistleblower Protection Act." § 10-16C-1 ("This act may be cited as the 'Whistleblower Protection Act.'"); *see also* §§ 10-16C-2, 4-6 (referring to the act by its title). This appeal centers on the interplay between Sections 10-16C-2 and 10-16C-3 of the NMWPA. Section 10-16C-3(A) prohibits a public employer from taking retaliatory action against a public employee who "communicates to the public employer or a third party" conduct that the "employee believes in good faith" to be an "unlawful or improper act." Section 10-

---

[1]"Headings and titles may not be used in construing a statute or rule unless they are contained in the enrolled and engrossed bill or rule as adopted. NMSA 1978, § 12-2A-13 (1997); *see Black's Law Dictionary* 186 (9th ed. 2009) (defining an 'engrossed bill' as a 'bill in a form ready for final passage by a legislative chamber' and an 'enrolled bill' as a 'bill passed by both houses of the legislature and signed by their presiding officers')." *Tri-State*, 2012-NMSC-039, ¶ 18. Both the statutory section enumerating this principle and the *Black's Law Dictionary* definitions are the same today. *See* § 12-2A-13; *Black's Law Dictionary* (12th ed. 2024). Because both the House Bill 165 and Session Law refer to the act at issue as the "Whistleblower Protection Act," we conclude that the enrolled and engrossed requirements are met and proceed to consider the NMWPA's title in determining legislative intent. *See Tri-State*, 2012-NMSC-039, ¶ 19 (considering an act's title to determine legislative intent when the Senate Bill and Session Law both included the relevant language); H.B. 165, 49th Leg., 2nd Reg. Sess. (N.M. 2010) ("ENACTING THE WHISTLEBLOWER PROTECTION ACT"); *accord* 2010 N.M. Laws, ch. 12, § 1 (same).

16C-2(E) defines the term "unlawful or improper act" as comprising "a practice, procedure, action or failure to act on the part of a public employer that"

> (1) violates a federal law, a federal regulation, a state law, a state administrative rule or a law of any political subdivision of the state; (2) constitutes malfeasance in public office; or (3) constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public.

{24} The policy goals of the NMWPA are to promote "transparent government and the rule of law." *Flores v. Herrera*, 2016-NMSC-033, ¶ 9, 384 P.3d 1070; *see also Velasquez v. Regents of N. N.M. Coll.*, 2021-NMCA-007, ¶¶ 27, 65, 484 P.3d 970 (reiterating the policy goals articulated in *Flores* and adding that the NMWPA also aims "to encourage employees to engage in whistleblowing and other protected activity and, when they do so, to discourage employers from retaliating").

**3.     The Court of Appeals' textual reading of the NMWPA is unduly narrow**

{25} The Court of Appeals panel in *Lerma* correctly reasoned that "analysis of what the Legislature intended to protect must be driven primarily by the plain language of the NMWPA." *Lerma*, 2024-NMCA-011, ¶ 11 (citing *Martinez v. Cornejo*, 2009-NMCA-011, ¶ 11, 146 N.M. 223, 208 P.3d 443). The *Lerma* Court criticized the *Wills* Court for skipping statutory interpretation's key first step—a plain meaning analysis. *Id.* ¶ 21. However, in focusing myopically on the primacy of plain meaning and on that methodological error of the *Wills* Court, the *Lerma* Court skipped an

13

equally important step mandated by our statutory interpretation jurisprudence. The *Lerma* Court never considered whether the statutory language of the NMWPA is ambiguous or if the literal meaning "would be absurd, unreasonable, or otherwise inappropriate," necessitating further inquiry. *See Truong*, 2010-NMSC-009, ¶ 37; *Bishop*, 2009-NMSC-036, ¶ 11. Instead, the *Lerma* Court simply "found nothing in the text of the NMWPA . . . that requires . . . that the communication pertain to a matter of public concern or benefit the public." *Lerma*, 2024-NMCA-011, ¶ 11. This lack of engagement with the statutory text was error.

{26} From a purely textual perspective, the *Lerma* Court was correct in concluding that no express mandate in the text of the NMWPA requires a disclosure of information to bear on a matter of public benefit in order to be protected from retaliation under the statute. *See id.* But it is equally true that no countervailing mandate in the text of the NMWPA permits personal employment grievances to qualify as protected conduct under the statute. In fact, a public employee who reports a matter that "constitutes gross mismanagement, a waste of funds, an abuse of authority or a substantial and specific danger to the public" as defined in Section 10-16C-2(E)(3) is specifically protected from employer reprisals under Section 10-16C-3(A) for "communicat[ing]" that "unlawful or improper act." Disclosure of any of

14

these matters would benefit the public, consistent with the definition of the term "whistleblower," discussed in the next section.

{27} We disagree with the Court of Appeals' reasoning in *Lerma*, 2024-NMCA-011, ¶¶ 11, 24, that its strict textual analysis of the NMWPA was "buttressed" by the absence from UJI 13-2322 NMRA of any direct mention of a public benefit requirement. *Id.* (explaining the scope of "protected activity" and defining "unlawful or improper act" as those terms are used in the NMWPA). To begin, this absence should come as no surprise, considering that the instruction defines the term "unlawful or improper act" by tracking the express language of the statute.

{28} The absence of the public benefit requirement from the instruction carries no value as evidence of legislative intent. The language adopted by this Court in its jury instructions are generally viewed as "a presumptively correct statement of the law." *Lerma*, 2024-NMCA-011, ¶ 11 (citing *State v. Wilson*, 1994-NMSC-009, ¶ 5, 116 N.M. 793, 867 P.2d 1175). But the key term here is *presumptively*, and thus not conclusively. The uniform jury instructions meticulously adopted by this Court are sometimes found to be incorrect and require subsequent modification or revision. *See, e.g., State v. Taylor*, 2024-NMSC-011, ¶ 1, 548 P.3d 82 (noting recent amendments to our jury instructions for child abuse that were instigated by separate instances in which they were found to be lacking, one because the instructions did

15

not "adequately capture[] the true nature of the crime and the legislative intent behind the statute" and the other because "dissonance between our case law and our jury instructions caused confusion" (internal quotation marks and citations omitted)). This is a matter that we refer to the appropriate rules committees to review.

**4. A broader statutory analysis is warranted and indicates that the Legislature intended a public benefit requirement**

{29} In place of the purely textual analysis undertaken by the Court of Appeals, legislative intent is best determined in this case by making use of the full array of interpretive tools available to a reviewing court. The failure to read a public benefit requirement in the NMWPA "would be absurd, unreasonable, or otherwise inappropriate in application." *Bishop*, 2009-NMSC-036, ¶ 11. Although we "will not read into a statute language which is not there," we must construe the parts of the NMWPA harmoniously, including the act's title. *See Britton*, 2019-NMCA-002, ¶ 28 (internal quotation marks and citation omitted) (explaining that construing parts of an act harmoniously need not involve reading into an act language that is not there); *Tri-State*, 2012-NMSC-039, ¶ 18 (explaining that a title may be considered part of an act if "necessary to its construction"). Here, the title of the NMWPA and its body includes a term of art that carries its own idiosyncratic meaning: *whistleblower*. *See* § 10-16C-1 ("This act may be cited as the 'Whistleblower

16

Protection Act.'"); §§ 10-16C-2, -4 to -6 (referring to the act by its title in the statutory text).

{30} The repeated use of the term *whistleblower* in the NMWPA's title and body is a strong indicator of legislative intent for a public benefit requirement. The Legislature "is presumed to know the law, including the laws of statutory construction" as well as definitions of technical and other terms of art. *Chavez v. Am. Life & Cas. Ins. Co.*, 1994-NMSC-037, ¶ 9, 117 N.M. 393, 872 P.2d 366; *see also* 73 Am. Jur. 2d *Statutes* § 143 (2012) ("It is a cardinal rule of statutory construction that when [a legislature] employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."). Since neither the NMWPA nor our caselaw define the term whistleblower, "we look for guidance" without adopting "analogous law in other states or the federal system" that "is substantially similar to the [NMWPA]". *Gandydancer, LLC v. Rock House GCM, LLC*, 2019-NMSC-021, ¶ 38, 453 P.3d 434 (internal quotation marks and citation omitted).[2] Federal guidance is

---

[2]The first and third elements of Section 10-16C-2(E) closely track the provisions of the federal WPA. *See* 5 U.S.C. § 2302(a)(2)(D). The NMWPA and the federal WPA diverge in one respect: The *waste of funds* element set out in the WPA is modified by the adjective *gross*, while that same element in the NMWPA has no modifier. *Compare* 5 U.S.C. § 2302(a)(2)(D)(ii), *with* § 10-16C-2(E)(3).

17

frequently considered in statutory analysis by New Mexico courts. *Compare State v. Loza*, 2018-NMSC-034, ¶ 12, 426 P.3d 34 (pointing to the similarities between New Mexico's Racketeering Act and the federal counterpart RICO statute in recognizing that "we look to federal cases interpreting RICO for guidance in interpreting our Act"), *and Trujillo v. N. Rio Arriba Elec. Co-op, Inc.*, 2002-NMSC-004, ¶ 8, 131 N.M. 607, 431 P.3d 333 (looking to the federal Americans with Disabilities Act for guidance in interpreting New Mexico's Human Rights Act where the relevant terms used in the two counterpart statutes, though different, were "viewed as interchangeable"), *with Velasquez*, 2021-NMCA-007, ¶ 31 (declining to adhere to federal whistleblower precedent in determining whether a particular communication concerning the use of grant funds constituted protected conduct under the NMWPA, in view of the "material difference between the plain language of the [New Mexico] and federal [whistleblower] statutes" in connection with the "waste of funds" element of Section 10-16C-2(E)(3), an element not germane to the case at hand).

{31}    The term "whistleblower" has been defined as a person "who, believing that the public interest overrides the interest of the organization [that individual] serves, publicly blows the whistle if the organization is involved in corrupt, illegal, fraudulent, or harmful activity." *Young v. Schering Corp.*, 660 A.2d 1153, 1157 (N.J. 1995) (internal quotation marks omitted) (quoting *Whistle Blowing: the Report of*

18

*the Conference on Professional Responsibility* vii (Ralph Nader *et al.*, 1972)); *see also* Robert G. Vaughn, *The Successes and Failures of Whistleblower Laws* ii (Edward Elgar Publ'g Ltd. 2012) (dedicating the author's whistleblowing treatise to "all those whistleblowers whose courage, perseverance, and suffering have contributed to the public good").

{32} Further, as the surveys of federal whistleblower case law undertaken by both *Wills* and *Montgomery v. Eastern Correctional Institution*, make clear, the distinction between "communications that benefit the public or pertain to matters of public concern," *Wills*, 2015-NMCA-105, ¶ 20, and "complaints by federal government employees that a supervisor's behavior violated the employee's individual employment rights," *Montgomery*, 835 A.2d 169, 178 (Md. 2003), is key in determining if whistleblower liability attaches under federal law. There are significant differences between the two statutory schemes—state and federal—that warn against imposing federally derived exemptions, restrictions, or expansions upon the NMWPA. That said, from a definitional perspective, we accept some circuit court conclusions that whistleblower disclosures "serve the public interest by assisting in the elimination of fraud, waste, abuse and unnecessary governmental expenditures." *Spruill v. Merit Sys. Prot. Bd.*, 978 F.2d 679, 692 (Fed. Cir. 1992) (internal quotation marks and citation omitted); *see also Ellison v. Merit Sys. Prot.*

*Bd.*, 7 F.3d 1031, 1035 (Fed. Cir. 1993) (explaining that whistleblowers "disclose government illegality, waste, and corruption"). The *Wills* Court's reliance on this line of cases is perhaps one reason the *Lerma* Court took issue with its reasoning. In the end, however, these federal cases are helpful in delineating what would be considered a purely private grievance and one involving public benefit by description of what type of claim is maintained purely in administrative claims and what is allowed to proceed outside of that and actionable through the federal WPA. *See, e.g., Spruill*, 978 F.2d 679; *Ellison*, 7 F.3d 1031.

{33} The *Lerma* Court believed that the *Wills* Court misinterpreted federal precedent, construing the *policy* underlying the federal statute as a *substantive legal requirement* that a communication is protected under the federal WPA only if it serves a public benefit. *Lerma*, 2024-NMCA-011, ¶ 22. Further, the *Lerma* Court believed that *policy* considerations were irrelevant to its analysis, considering the NMWPA's clear plain language, and doubted that the policies behind the NMWPA and WPA are similar. *Id.* ¶ 22 n.3. But as we have explained, we must construe the NMWPA harmoniously with its title, its wording, and the presumption the Legislature used this specific term with an understanding of its definition. While the policies behind the NMWPA and WPA are similar, we respect the differences in the

two acts, and our analysis maintains its solid footing on the construction of the statute itself.

{34}    The Court of Appeals, in reaching out to resolve this case on a threshold basis not advanced by the parties, adopted an unduly narrow textual reading of the NMWPA and failed to properly employ the statutory interpretation tools at its disposal. This was error that demands correction irrespective of the ultimate outcome of Defendants' summary judgment motion or the prudence and prescience of Amici's dire predictions of the consequences that would flow from an affirmance of the *Lerma* panel's narrow statutory analysis of the NMWPA.

**C.      *Wills* Remains Good Law on the Public Benefit Requirement**

{35}    In rejecting *Lerma*'s premise that the protected status of a public employee's communication under the NMWPA should no longer "hinge on whether [it] pertains to a matter of public concern or on whether [it] furthers a public interest," 2024-NMSC-011, ¶ 15, we recognize that the contrary view expressed in *Wills* remains good law on this point. As the *Wills* Court held, communications that "[do] not pertain to a matter of public concern" are not "protected whistleblowing activity." 2015-NMCA-105, ¶¶ 18, 21 (internal quotation marks omitted).

{36}    However, the *Wills* Court observed that "courts interpreting the federal whistleblower protection law have distinguished 'whistleblowing' that benefits the

21

public by exposing unlawful and improper actions by government employees from communications regarding personal personnel grievances that *primarily* benefit the individual employee." *Id.* ¶ 20 (emphasis added) (citing *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1368 (Fed Cir. 2012); *Winfield v. Dep't of Veterans Affs.*, 348 Fed. Appx. 577, 580 (Fed. Cir. 2009) (per curiam); *Riley v. Dep't of Homeland Sec.*, 315 Fed. Appx. 267, 270 (Fed. Cir. 2009); *Willis v. Dep't of Agric.*, 141 F.3d 1139, 1143 (Fed. Cir. 1998); *Montgomery*, 835 A.2d at 180)). But we find no language supporting a primacy requirement in the cases cited to support this observation. In engaging in the fact-specific inquiry that *Wills* requires, New Mexico courts need to be mindful that "there is nothing inherently contradictory about disclosing serious misconduct [that bears "directly on a matter of significant public concern,"] while also defending one's own professional reputation," and that public employee disclosures of government misconduct that are capable of standing "separate and apart from [any] individualized personnel dispute" may well be deserving of whistleblower protection. *See Coleman v. District of Columbia*, 794 F.3d 49, 59 (D.C. Cir. 2015). Therefore, *Coleman* supports the view that we adopt today: a public employee's disclosure of illegality or wrongdoing qualifies for protected whistleblower status, if otherwise eligible, so long as the disclosure confers a benefit

on the public, irrespective of which benefit—public or personal—may be said to predominate.

**III.  CONCLUSION**

{37}  We reverse the ruling of the Court of Appeals insofar as it rejected a public benefit requirement for a public employee's disclosure to qualify for whistleblower protection under the NMWPA. We remand the case to the Court of Appeals to determine, consistent with this opinion, whether Defendants are entitled to summary judgment dismissing the complaint.

{38}  **IT IS SO ORDERED.**

_____

**DAVID K. THOMSON, Chief Justice**

**WE CONCUR:**

_____

**MICHAEL E. VIGIL, Justice**

_____

**C. SHANNON BACON, Justice**

_____

**JULIE J. VARGAS, Justice**

_____

**BRIANA H. ZAMORA, Justice**